People v Watkins (2020 NY Slip Op 01403)





People v Watkins


2020 NY Slip Op 01403


Decided on February 27, 2020


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: February 27, 2020

109313 109299

[*1]The People of the State of New York, Respondent,
v
Rasaun Watkins, Also Known as Five, Appellant.

Calendar Date: January 10, 2020

Before: Garry, P.J., Mulvey, Devine, Pritzker and Colangelo, JJ.


Bruce Evans Knoll, Albany, for appellant.
Robert M. Carney, District Attorney, Schenectady (Peter H. Willis of counsel), for respondent.



Pritzker, J.
Appeal from a judgment of the County Court of Schenectady County (Sira, J.), rendered February 9, 2017, upon a verdict convicting defendant of the crimes of rape in the third degree, criminal sexual act in the third degree, endangering the welfare of a child, unlawful fleeing a police officer in a motor vehicle in the third degree and resisting arrest.
Defendant was charged in the first of two indictments with rape in the third degree, criminal sexual act in the third degree and endangering the welfare of a child. These charges stemmed from an incident in November 2015 when defendant, then 32 years old, engaged in sexual acts with the victim, a 16-year-old female. In the second indictment, defendant was charged with unlawful fleeing a police officer in a motor vehicle in the third degree and resisting arrest in connection with a traffic stop during which defendant fled at an excessive speed, later stopped his car, ran on foot and then hid from police and failed to comply with orders to facilitate his arrest. At the People's request, County Court (Sypniewski, J.) ordered defendant to submit to a buccal swab and granted the People's unopposed motion to consolidate the two indictments. Following a seven-day jury trial, defendant was found guilty of all counts. Defendant was thereafter sentenced, as a second felony offender, to concurrent prison terms of four years, to be followed by 10 years of postrelease supervision, on each conviction of rape in the third degree and criminal sexual act in the third degree, and to lesser concurrent terms of incarceration on the remaining counts. Defendant appeals. We affirm.
Defendant contends that his convictions were not supported by legally sufficient evidence and are against the weight of the evidence. In reviewing legal sufficiency, this Court must "view the evidence in the light most favorable to the People and evaluate whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial and as a matter of law satisfy the proof and burden requirements for every element of the crime charged" (People v Henry, 173 AD3d 1470, 1473 [2019] [internal quotation marks and citations omitted], lv denied 34 NY3d 932 [2019]). In contrast, weight of the evidence review "involves a two-step approach wherein [the] [C]ourt must (1) determine whether, based on all the credible evidence, an acquittal would not have been unreasonable; and (2) weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony" (People v Sanchez, 32 NY3d 1021, 1023 [2018] [internal quotation marks, brackets and citations omitted]).
Pertinent here, "[a] person is guilty of rape in the third degree when[,] . . . [b]eing [21] years old or more, he or she engages in sexual intercourse with another person less than [17] years old" (Penal Law § 130.25 [2]), and "[a] person is guilty of criminal sexual act in the third degree when[,] . . . [b]eing [21] years old or more, he or she engages in oral sexual conduct . . . with a person less than [17] years old" (Penal Law § 130.40 [2]). "A person is guilty of endangering the welfare of a child when . . . [h]e or she knowingly acts in a manner likely to be injurious to the physical, mental or moral welfare of a child less than [17] years old" (Penal Law § 260.10 [1]). "A person is guilty of unlawful fleeing a police officer in a motor vehicle in the third degree when, knowing that he or she has been directed to stop his or her motor vehicle by a uniformed police officer or a marked police vehicle by the activation of either the lights or the lights and siren of such vehicle, he or she thereafter attempts to flee such officer or such vehicle by driving at speeds which equal or exceed [25] miles per hour above the speed limit" (Penal Law § 270.25). Finally, "[a] person is guilty of resisting arrest when he [or she] intentionally prevents or attempts to prevent a police officer or peace officer from effecting an authorized arrest of himself[, herself] or another person" (Penal Law § 205.30).
At trial, the victim testified that on the date of the incident she was 16 years old. Defendant's birth certificate, which was admitted into evidence, reveals that he was 32 years old at the time of the incident. The victim explained that, during the day, she was with Roshan "Jungle" Lalchan and Africa Klu at an electronics store, which was run by Elvin Singh, and that she, Klu and Lalchan were drinking alcohol. Around 8:30 p.m., after consuming about four drinks, the victim left with Lachlan and went to Elvin Singh's house. She testified that, when she first arrived in the house, multiple people were present, including Lalchan, Klu and Andrick Singh (hereinafter Singh), Elvin Singh's brother, but that defendant was not present at that time. According to the victim, Elvin Singh was home only briefly. The victim testified that she consumed another four or five alcoholic drinks with Klu, and the two began to kiss in the living room and then moved to an upstairs bedroom where Lalchan was also present. According to the victim, Klu then had vaginal intercourse with her. Then, at Klu's insistence, Lalchan began vaginal intercourse with the victim, and Klu had the victim perform oral sex on him. Singh then entered the bedroom and began having vaginal intercourse with the victim. Thereafter, defendant entered the bedroom and the victim performed oral sex on him. According to the victim, after Singh "got off of [her]," defendant began vaginal intercourse with her, "after [she] tried to push him off of [her]." The victim testified that the bedroom was dark, but that the door was cracked so that she could still see "a little bit" from a hallway light. The victim identified defendant in the courtroom by the name Five and testified that he was not present in the living room earlier in the evening and that she did not personally know him, but that she recognized him because he came into the electronics store earlier that day. The victim testified that, after the incident, she got dressed and vomited in the living room and then Singh drove her home. Her mother and father were home when she arrived and, after police and paramedics arrived, she was taken to a hospital and underwent a physical examination. She testified that she was wearing a pair of ripped blue jeans with white leggings, a pink shirt, a bra and underwear on the night of the incident. During direct examination, the victim acknowledged that she initially told police that she had been held down and forcibly raped, but she testified at trial that that was not the truth and that she lied because she did not want to be judged and did not want her family to know the truth.
On cross-examination, the victim acknowledged that she first reported to police that the room was dark and that she could not see who was having intercourse with her and that she did not initially mention defendant. She did not know, or could not recall, whether Lalchan or Klu remained in the bedroom while defendant and Singh had intercourse with her, but acknowledged that she had previously testified before the grand jury that Klu and Lalchan were present and holding her arms down. Defense counsel then questioned the victim as to where her underwear was during the incident and whether she had put it back on when she got dressed, to which the victim responded, "I don't know" and "I don't want to be here. I want to go home." After this, the jury was excused to permit the witness time to "compose herself," and she "walk[ed] off the stand before [County Court] had excused her." After the People's investigator and the prosecutor located the victim and returned her to the courtroom, the jury reconvened and she resumed her testimony. The victim then testified, in contrast to her answer prior to leaving the stand, that she located her underwear next to her shoes in the bedroom and that she was wearing underwear when she went downstairs.
Singh testified that he knew defendant by the name Five and identified him in the courtroom. He testified that on the night of the incident, Elvin Singh, Klu, Lalchan and the victim were at Elvin Singh's house, but that Elvin Singh left the house prior to any sexual contact occurring with the victim. Singh's description of the victim's clothing that evening matched the victim's testimony. According to Singh, Klu and the victim were drinking in the living room; later, Singh went upstairs with the victim to have sex in a bedroom and no one else was present at that time. Klu later entered the bedroom, and he and Singh continued to engage in sexual acts with the victim. According to Singh, after he returned to the living room, he saw defendant enter the house. Thereafter, Singh returned to the bedroom with defendant, at which time he saw Lalchan engaged in intercourse with the victim. Singh testified that he had vaginal intercourse with the victim again while she performed oral sex on defendant and that he and defendant later "switched." According to Singh, although there were no lights on in the room, there was enough light that "things [were] still distinguishable." Singh testified that sexual contact with the victim stopped after "she call[ed] out for [Klu]," and then Singh and the others helped her get dressed and took her downstairs. Singh testified that the victim "g[ot] sick" once she was in the living room and that he drove her home. He testified that the victim left her cell phone at the house. Singh acknowledged that his testimony was given as part of a cooperation agreement under which, if he testified truthfully, he would receive a sentence of time served on one count of endangering the welfare of a child, to which he pleaded guilty.
Elvin Singh also testified at trial and identified defendant in the courtroom as a person he knew as Five. He stated that, although he went home around 8:00 p.m. that evening, he did so only briefly before leaving to go to his girlfriend's house for the night. He testified that when he left the house, the victim, Klu, Singh and Lalchan were present and that he saw the victim and Klu drinking. According to Elvin Singh, defendant was not present at that time. He testified that Singh and Klu later told him that they had sex with the victim. The victim's mother testified that the victim was 16 years old at the time of the incident. She stated that the victim arrived home a little after midnight and that she was wearing white leggings, holding a pair of jeans and shoes in her hands, her hair was a mess and she was acting "frantic." The mother testified that the victim was crying and told her "they raped me." The mother called 911 and the victim was taken to the hospital by ambulance and lost consciousness on the way. Nicholas Mannix, a police officer, testified that he responded to the victim's home at about 12:21 a.m. and that, when he went to speak with the victim in her bedroom, she was "in the fetal position and pretty much crying hysterically" and "breathing very heavily," and "it took a couple of minutes just to get her to calm down to have any type of conversation whatsoever." According to Mannix, once the victim was calm enough to speak, she reported that she was raped. Although she mentioned Klu, Lalchan and a man named Nick, she did not provide defendant's name or the name Five at that time.
A registered nurse and certified sexual assault forensic examiner testified that she performed a "safe" exam on the victim after her arrival at the hospital. Prior to the physical exam, the nurse collected the victim's clothing, separating the underwear in an envelope in the evidence collection kit. The nurse testified that the victim was unable to tolerate a portion of the exam due to pain, but that she was still able to obtain various swabs from the victim using sterile procedures. Two police detectives with training in evidence collection took photographs of the house where the incident occurred and of the electronics store. One of the photographs taken at the house showed a plastic bag in the living room of the house that was filled with napkins and vomit, and photographs taken at the electronics store showed bottles and cans of alcohol. Two other detectives, both of whom have training in evidence collection, testified that they each obtained DNA samples from defendant, one by obtaining a buccal swab and the other by collecting a styrofoam cup used by defendant while he was interviewed at the police station.
Richard Brunt, a DNA analyst and serologist with the State Police Forensic Investigation Center, testified that he generated a serology report, which was admitted into evidence, and that, following an examination, he concluded that perianal, vulvar and vaginal swabs taken from the victim, her underwear and a condom were "sperm positive." Cheryl Strevell, a forensic scientist with the State Police Forensic Investigation Center, testified that, in addition to preparing the evidence examined by the DNA analyst and serologist, she also prepared the evidence examined from the styrofoam cup used by defendant and the buccal swabs submitted by defendant — which she also referred to as the "control swabs" — for DNA extraction. Strevell testified that she wrote two reports, which were admitted into evidence, based upon her own interpretations and conclusions of the DNA profile generated from the samples that she prepared. In this regard, she concluded that sperm recovered from the victim's underwear was consistent with defendant's DNA and that, although the underwear sample contained DNA from at least two additional donors, she determined that defendant was "the major contributor," meaning that he contributed "three times more DNA than the other contributors present in that mixture profile." Strevell opined that "[t]he probability of selecting an unrelated individual with a profile matching [defendant] to [the underwear profile] is less than one in 300 billion." However, defendant was not determined to be a major contributor, primary source or single profile in any other location tested on the victim.
Another police detective testified that Klu and Singh were arrested in association with this case in the days following the incident, and that a "be on the look out" alert was issued for defendant approximately two weeks later. This detective testified that he interviewed defendant following his arrest in early December 2015, and a video of the interview was entered into evidence and published to the jury. At the end of the interview, the video shows that a detective collected a styrofoam cup used by defendant.
As to the charges related to the traffic stop, Adam Willetts, a police officer, testified that he successfully completed training in "learning how to estimate speed visually and using radar." Willetts testified that, in early December 2015, he observed a driver in a vehicle matching the alert issued for defendant, and he identified defendant in the courtroom as that driver. Footage from Willetts' police car camera, which was admitted into evidence, showed that, after Willetts initiated a traffic stop, defendant pulled off and sped away at a high rate of speed. Willetts testified that, based upon his training, defendant was traveling at approximately 70 miles per hour in a 30 mile-per-hour zone. Defendant ultimately abandoned his vehicle, after which Willetts, and other responding police officers, including Christopher Wilgocki and Albert Rivera, pursued him on foot. Rivera testified that when he encountered defendant, he was "hidden underneath a vehicle" parked in the backyard of a home. After defendant failed to comply with multiple verbal commands to come out from under the vehicle, Rivera and another officer pulled him out. Rivera testified that, once out from under the vehicle, defendant would not comply with commands to put his hands behind his back, holding his hands tight to his body. Wilgocki similarly testified that defendant was noncompliant.
Derek Milner, an inmate at the Schenectady County Jail, testified that he had been housed close to defendant, who he knew as Five, and that defendant disclosed to him that he had sex with the victim and that he had been later involved in a "high speed chase with officers." Milner testified that, as part of a cooperation agreement if he testified honestly, he would receive sentencing benefits. The testimony of a correction officer with the Schenectady County Sheriff's Department confirmed that defendant and Milner were housed in the same unit at the same time. Defendant's wife also testified and confirmed defendant's date of birth and stated that she could not recall whether defendant, with whom she lived, was home at the time of the incident.
In his defense, defendant testified that, on that day of the incident, he left his home a little after 10:00 p.m. to meet Klu at Elvin Singh's house and drive him home. He testified that he entered the house for no more than four or five minutes and that he saw Klu, Lalchan, Singh and another person, but that he did not see the victim. He then left the house and drove Klu home and denied having sex with the victim. When asked how his sperm got on the victim's underwear, he responded that he had "no clue" and further denied having masturbated or ejaculated while he was in the house. As to the traffic stop, defendant testified that he was driving while intoxicated and "smoking weed and drinking." He testified that, after a police vehicle began to follow him, he "sped up a little more to do the
speed[ ] limit." He stated that he ran and hid from police because he did not have a license, had been drinking and had "paraphernalia" in his car. Although he admitted that he knew Milner from jail, he adamantly denied that they had discussed this case. He testified that he goes by the nickname A-five and he has never gone by the name Five, but admitted that "[a]nybody with the name of anything Five can go by the name Five." He testified that he had previously lied under oath.
We turn first to the convictions of those counts involving sexual conduct with the victim, which defendant argues are not supported by legally sufficient evidence and are against the weight of the evidence because the victim's testimony was incredible as a matter of law. "[T]estimony is incredible as a matter of law if it is inherently unworthy of belief because it is 'manifestly untrue, physically impossible or contrary to human experience'" (People v Johnson, 176 AD3d 1392, 1393 [2019], lv denied ___ NY3d ___ [Jan. 15, 2020], quoting People v Toland, 2 AD3d 1053, 1055 [2003]). Contrary to defendant's contention, although the victim initially told police that she was forcibly raped, and later admitted that that was not true, this fact was brought out during direct examination, giving defendant ample opportunity to cross-examine her about it and, most importantly, the jury was made aware of this circumstance when assessing her credibility (see People v Johnson, 176 AD3d at 1393-1394; People v Werkheiser, 171 AD3d 1297, 1301, lv denied 33 NY3d 1109 [2019]). Further, although the victim's testimony about the sexual contact differed from that of Singh, we do not find that these minor inconsistencies render her testimony "inherently unbelievable or incredible as a matter of law" (People v Russell, 116 AD3d 1090, 1092 [2014]). Accordingly, we find that the evidence presented at trial as to these convictions, when viewed in the light most favorable to the People, was legally sufficient to support the verdict. However, based upon the inconsistencies in the victim's accounts of the sexual contact, as well as the inconsistencies between the victim and Singh's testimony, a different verdict would not have been unreasonable. Our review of the record reveals that, despite these minor inconsistencies, the testimony of the victim, which the jury found to be credible, was largely corroborated by Singh, as well as other witnesses and the DNA evidence. Thus, viewing the evidence in a neutral light and according deference to the jury's credibility determinations, we find the verdict as to these convictions to be in accord with the weight of the evidence (see People v Werkheiser, 171 AD3d at 1301).
As to the convictions related to the traffic stop, contrary to defendant's assertion, Willetts' testimony regarding his training and experience in visually estimating speed established a proper basis for his opinion that defendant was traveling approximately 35 miles per hour over the speed limit (see People v Olsen, 22 NY2d 230, 231-232 [1968]). Accordingly, viewing the evidence in the light most favorable to the People, we find that defendant's convictions for unlawful fleeing a police officer in a motor vehicle in the third degree and resisting arrest were supported by legally sufficient evidence. Additionally, although another verdict would not have been unreasonable had the jury credited defendant's testimony, "viewing the evidence in a neutral light and giving deference to the jury's credibility determinations, we are satisfied that the verdict is not against the weight of the evidence" (People v Montes, 178 AD3d 1283, 1285 [2019]).
We also find that County Court properly granted the People's application to obtain a buccal swab sample from defendant for scientific analysis, pursuant to CPL 240.40 (2) (b) (v). Under the guidelines established by the Court of Appeals, a court order to obtain a bodily sample from a suspect may be issued "provided the People establish (1) probable cause to believe the suspect has committed the crime, (2) a 'clear indication' that relevant material evidence will be found, and (3) the method used to secure it is safe and reliable" (Matter of Abe A., 56 NY2d 288, 291 [1982]; accord People v Roshia, 133 AD3d 1029, 1030 [2015], affd 28 NY3d 989 [2016]). Further, "the issuing court must weigh the seriousness of the crime, the importance of the evidence to the investigation and the unavailability of less intrusive means of obtaining it, on the one hand, against concern for the suspect's constitutional right to be free from bodily intrusion on the other" (Matter of Abe A., 56 NY2d at 291; see People v Roshia, 133 AD3d at 1030). Defendant does not dispute that the People's moving papers established probable cause and that a buccal swab is a safe and reliable method of obtaining a bodily sample; rather, he essentially argues that the People failed to demonstrate a "clear indication" that relevant material evidence would be found. Given that the People established that a sexual evidence assault kit had been secured from the victim, as well as condoms and a stained cutting from the mattress at the address where the crimes occurred, to which the People sought to match defendant's DNA, the People sufficiently established a "clear indication" that the buccal swab sample would supply relevant material evidence (see People v Fields, 160 AD3d 1116, 1118 [2018], lvs denied 31 NY3d 1116, 1120 [2018]; People v Roshia, 133 AD3d at 1030). Based upon the foregoing, and in balancing the severity of the crimes, which involved a minor, and the People's stated need for "a suitable control sample" against the relatively minimal intrusion upon defendant's body when taking a buccal swab, County Court properly granted the People's motion (see People v Pryor, 14 AD3d 723, 725 [2005], lvs denied 6 NY3d 779 [2006]; Matter of Chaplin v McGrath, 215 AD2d 842, 842-843 [1995]). We are unpersuaded by defendant's further contention that a buccal swab was unnecessary because his DNA was previously added to the "DNA database" related to a prior conviction (see generally People v Afrika, 13 AD3d 1218, 1219-1220 [2004], lv denied 4 NY3d 827 [2005]).
To the extent preserved, we find no merit to defendant's contention that County Court violated his right to a public trial by excluding his wife from sitting in the courtroom prior to testifying for the People, especially considering that she was later permitted in the courtroom following her testimony (see People v Baker, 14 NY3d 266, 274 [2010]; People v Rivera, 70 AD3d 1177, 1180 [2010], lv denied 14 NY3d 891 [2010], lv denied 15 NY3d 855 [2010]). We also find lacking in merit defendant's allegation that, after the victim left the witness stand in the middle of cross-examination, the court erred in permitting the prosecutor to locate her and encourage her to return to finish her testimony. We find that People v Branch (83 NY2d 663 [1994]), upon which defendant relies, is inapposite to the circumstance presented here. Branch and its progeny involve the issue of "midtestimony conferences" in which a witness is permitted a pause in questioning to confer with his or her attorney or the prosecution (id. 666-667). Here, the victim — who had been called by the People to testify — left the witness stand during cross-examination without the court's permission, and there is no indication in the record that the prosecutor discussed the case with the victim while assisting in locating her and returning her to the courtroom. In fact, the prosecutor assured the court that he would not do so. Defendant's allegations are thus based upon mere speculation.
We similarly find defendant's argument that the admission of the DNA reports and related testimony violated the Confrontation Clause of the State and Federal Constitutions because the individual who conducted the DNA extraction did not testify to be unavailing. In addressing a defendant's rights under the Confrontation Clause, "'if an out-of-court statement is testimonial in nature, it may not be introduced against the accused at trial unless the witness who made the statement is unavailable and the accused has had a prior opportunity to confront that witness'" (People v John, 27 NY3d 294, 303 [2016], quoting Bullcoming v New Mexico, 564 US 647, 657 [2011]; see US Const, 6th Amend; NY Const, art I, § 6). When a DNA report is testimonial, "an analyst who witnessed, performed or supervised the generation of [a] defendant's DNA profile, or who used his or her independent analysis on the raw data, as opposed to a testifying analyst functioning as a conduit for the conclusions of others, must be available to testify" (People v John, 27 NY3d at 315 [emphasis added]). Here, Brunt testified that the report he generated in this case was based upon his "direct observations." Strevell testified that her role as a DNA analyst is to "analyze and interpret [DNA] profiles and . . . write reports on [her] findings." Strevell testified that she prepared the evidence examined by Brunt, the styrofoam cup used by defendant and the buccal swabs submitted by defendant — which she also referred to as the "control swabs" — for DNA extraction. Although Strevell acknowledged that she did not perform the DNA extraction, she testified that the reports that she wrote were based upon her own interpretations and conclusions of the DNA profile generated based upon the samples that she prepared. Accordingly, Strevell used her "independent analysis on the raw data" and, thus, the admission of the DNA reports into evidence was proper and did not violate the Confrontation Clause (see People v John, 27 NY3d at 313, 315; People v Carter, 176 AD3d 552, 552 [2019]; compare People v Austin, 30 NY3d 98, 104-105 [2017]).
Defendant also contends that he was deprived of a fair trial based upon various actions by the prosecutor. Specifically, he contends that the prosecutor unnecessarily denigrated him before the jury by eliciting certain testimony from the victim, introducing a certain photograph and by calling defendant's wife as a witness. Defendant further contends that the prosecutor articulated the improper burden of proof and, further, that he improperly commented on the evidence during summation. Defendant, however, failed to mount objections to any of the aforementioned conduct, and, as such, has failed to preserve these arguments for review (see People v Houze, 177 AD3d 1184, 1188 [2019]; People v Sostre, 172 AD3d 1623, 1626-1627 [2019], lv denied 34 NY3d 938 [2019]). Were these arguments before us, we could find that the People's summation constituted fair comment on the evidence and the reasonable inferences to be drawn therefrom, as well as a response to defendant's comments on the evidence in his summation (see People v Andrade, 172 AD3d 1547, 1553 [2019], lvs denied 34 NY3d 928, 937 [2019]).
Finally, defendant contends that his trial counsel provided ineffective assistance based upon various alleged failings. Initially, defendant faults trial counsel for failing to "formally" preserve objections to County Court not allowing defendant's wife to sit in the courtroom prior to her testimony and to the admission of the DNA reports admitted by the People. However, we have found these arguments to be sufficiently preserved and have addressed them on the merits. As to counsel's failure to object to the consolidation of the two indictments and certain comments made by the People during summation, "[c]ounsel will not be found to be ineffective on the basis that he or she failed to make an argument or motion that has little or no chance of success" (People v Urtz, 176 AD3d 1485, 1491 [2019] [internal quotation marks, brackets and citations omitted], lv denied ___ NY3d ___ [Jan. 31, 2020]). Trial counsel's alleged failure to object to the prosecutor's comments during summation would have had little or no chance of success and, thus, does not constitute ineffective assistance of counsel (see People v Andrade, 172 AD3d at 1553). Similarly, opposition to the People's motion to consolidate would have been unsuccessful as the People asserted that defendant's attempt to flee police during the December 2015 traffic stop under the second indictment was indicative of his guilt as to the charges in the first indictment and that the circumstances of the first indictment, in turn, provided necessary background to defendant's motives related to the charges in the second indictment (see CPL 200.20 [2] [b]; [4], [5]; People v Pendell, 164 AD3d 1063, 1070 [2018], affd 33 NY3d 972 [2019]). Defendant also argues that trial counsel erred in not allowing him to explain how his DNA got into the victim's underwear. However, defendant did answer this question the first time it was posed by the People by stating that he had "no clue"; therefore, defendant has failed to demonstrate an "absence of strategic or other legitimate explanations" for his counsel's later objection to the People's essentially identical question as "asked and answered" (People v Pratt, 162 AD3d 1202, 1203 [2018], lv denied 32 NY3d 940 [2018]). Defendant's remaining contentions have been reviewed and found to be without merit.
Garry, P.J., Mulvey, Devine and Colangelo, JJ., concur.
ORDERED that the judgment is affirmed.