People v Banch (2021 NY Slip Op 05894)





People v Banch


2021 NY Slip Op 05894


Decided on October 28, 2021


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:October 28, 2021

110447
[*1]The People of the State of New York, Respondent,
v
Christopher Banch, Appellant.

Calendar Date:September 8, 2021

Before:Garry, P.J., Clark, Aarons, Reynolds Fitzgerald and Colangelo, JJ.

Karen G. Leslie, Riverhead, for appellant.
Weeden A. Wetmore, District Attorney, Elmira (Philip A. Alvaro of counsel), for respondent.



Reynolds Fitzgerald, J.
Appeal from a judgment of the County Court of Chemung County (Rich Jr., J.), rendered June 8, 2018, upon a verdict convicting defendant of the crime of aggravated harassment of an employee by an incarcerated individual.
In October 2017, defendant, an incarcerated individual, was charged by indictment with the crime of aggravated harassment of an employee by an incarcerated individual stemming from allegations that he threw urine at a correction officer. Following a jury trial, defendant was convicted as charged. County Court sentenced defendant, as a second felony offender, to a prison term of 2 to 4 years, to run consecutively to the sentence that he was currently serving. Defendant appeals.
Defendant claims that the verdict was legally insufficient and against the weight of the evidence on the ground that the People failed to prove that he acted with the intent to harass, annoy, threaten or alarm the correction officer or to strike him with the urine. "When addressing a challenge to the legal sufficiency of the evidence, this Court evaluates whether the evidence, viewed in the light most favorable to the People, provides any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial and as a matter of law satisfy the proof and burden requirements for every element of the crime charged" (People v Watson, 174 AD3d 1138, 1139 [2019] [internal quotation marks and citations omitted], lv denied 34 NY3d 955 [2019]; see People v Acosta, 80 NY2d 665, 672 [1993]). "In contrast, weight of the evidence review involves a two-step approach wherein the Court must (1) determine whether, based on all the credible evidence, an acquittal would not have been unreasonable[,] and (2) weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony" (People v Watkins, 180 AD3d 1222, 1224 [2020] [internal quotation marks, brackets and citations omitted], lvs denied 35 NY3d 1026, 1030 [2020]; see People v Bleakley, 69 NY2d 490, 495 [1987]). As relevant here, "[a]n incarcerated individual . . . is guilty of aggravated harassment of an employee by an incarcerated individual when, with intent to harass, annoy, threaten or alarm a person in a facility whom he or she knows or reasonably should know to be an employee of such facility . . ., he or she causes or attempts to cause such employee to come into contact with . . . urine . . . by throwing, tossing or expelling such fluid or material" (Penal Law § 240.32).[FN1]
At trial, a correction officer (hereinafter the first correction officer) testified that, on December 10, 2016, he and another correction officer (hereinafter the second officer) were collecting refuse from the morning meal. Both officers wore their uniforms. When they arrived at defendant's cell, the first officer pushed the cart up to the gate, opened the hatch and [*2]saw defendant's hand at an angle with a styrofoam cup splashing a yellow substance that looked and smelled like urine. He stated that most of the liquid landed on the cart, although some also reached the floor. The second officer, who was positioned to the left of the cart, jumped away when the liquid came at him and, after defendant's hand was back in the cell, the first officer closed the hatch. The first officer testified that, immediately thereafter, defendant yelled that he "was gonna keep doing this every time that [the officers] opened his hatch and that [the officers] were gonna have to come in and get him" from his cell, wherein he "would f*** [the officers] up." The first officer further testified that he checked on the second officer to see whether he had any liquid on him and noticed a wet spot on the left side of his body. He circled the spot on the second officer's shirt with a black marker and, when the second officer removed his shirt, the first officer placed it in a brown evidence bag and gave it to the correction sergeant.
The second officer testified that he worked during defendant's breakfast feed and clean up on December 10, 2016. He affirmed that he and the first officer were collecting the breakfast trash and, after the refuse cart was in place by defendant's cell, defendant suddenly threw a yellow liquid substance in his direction, causing him to twist away from the cart. Despite his evasive action, some of the substance hit him. He further testified that he removed his shirt and gave it to the first officer and left the area. The correction sergeant supervising the cell block on the day of the incident testified that he saw the second officer twist away from the cart. The sergeant relieved the second officer from duty and subsequently received the soiled uniform shirt and gave it to a third correction officer who the sergeant instructed to preserve it as evidence.
The third officer testified that on the day of the incident, he performed evidence collection. He surveyed the scene and observed fluids in front of defendant's cell and in the cart. He took samples, measurements and pictures of the fluids in defendant's cell gate, from the floor area in front of defendant's cell and from the cart. He also received the second officer's shirt from the correction sergeant. Additionally, he testified that he took all the evidence to a secure area with limited access. Two days later, he boxed the shirt and other evidence in a secure bag and mailed the items to a lab for testing. A serologist with the State Police testified with respect to the tests performed to determine whether the substance on the uniform shirt, as well as that preserved from the cart and floor, was indeed urine. Although defendant argues that those tests on the shirt were inconclusive, the tests with regard to those gathered from the floor and the cart tested positive for urine.
Defendant presented a different version of the events. He testified [*3]that he filed numerous grievances alleging that his property had been tampered with by correction officers. Based on the failure to respond to his multiple grievances, defendant determined that he would engage in certain behaviors — including throwing urine — in an attempt to be transferred out of the correctional facility. Defendant stated that, on the morning of the incident, some of his breakfast items were missing. When the correction officers arrived at his cell to collect the breakfast refuse, he was "doing what [he] was doing for the past several weeks; throwing urine, throwing feces, kicking, screaming . . . but not with . . . intentions of assaulting an officer. With the intention that these people get tired of me and move me. To avoid starvation." Thereafter, defendant testified that, as to this particular incident, he modified his behavior, not to the extent that the substance at issue was not urine, but rather that he did not throw the urine, but, instead, he "just tipped the cup over."
Based on the correction officers' testimony and the statement that defendant made at the time of the incident, it may reasonably be inferred from defendant's conduct and the surrounding circumstances that defendant had the intent to harass, annoy, threaten or alarm the correction officers and to throw the urine at them (see People v Rodriquez, 17 NY3d 486, 489 [2011]; People v Thomas, 24 AD3d 949, 949 [2005], lv denied 6 NY3d 819 [2006]). Viewing the evidence in the light most favorable to the People, we find that the evidence was legally sufficient to satisfy the proof and burden requirements for every element of the crime charged, including that defendant acted with the requisite intent (see People v Merrill, 27 AD3d 773, 774 [2006], lv denied 6 NY3d 896 [2006]; People v Burkett, 12 AD3d 1196, 1197 [2004], lv denied 4 NY3d 762 [2005]). "Although a different verdict would not have been unreasonable had the jury chose to credit defendant's testimony, issues of credibility are within the province of the jury and we accord great deference to such credibility determinations" (People v Figueroa, 53 AD3d 779, 780 [2008] [citations omitted], lv denied 11 NY3d 832 [2008]). Viewing the evidence in a neutral light, we find that the verdict was not against the weight of the evidence (see People v Poulos, 144 AD3d 1389, 1391 [2016]; People v Smith, 96 AD3d 1088, 1089 [2012], lv denied 20 NY3d 935 [2012]).
Defendant additionally contends that County Court erred in allowing him to be shackled during a portion of the trial. It is well settled that "a defendant has a right to be free of visible restraints during criminal proceedings unless the trial court states a case-specific reason for their use" (People v Alexander, 127 AD3d 1429, 1432 [2015], lv denied 25 NY3d 1197 [2015]; see People v Best, 19 NY3d 739, 743 [2012]; People v Clyde, 18 NY3d 145, 152 [2011], cert denied 566 US 944 [2012]). The use of shackles has been deemed appropriate "for reasons [*4]of security, to prevent disruption of the trial, harm to those in the courtroom, escape or release of the accused, or the commission of other crimes" (People v Greiner, 156 AD2d 813, 817 [1989], lv denied 75 NY2d 919 [1990]). The record discloses that, in making its determination, County Court considered the nature of the crime with which defendant was charged, deferred to the correction officers' recommendations and referenced defendant's verbal outbursts throughout the morning. These are insufficient reasons to restrain defendant (see People v Arce, 150 AD3d 1403, 1406 [2017], lv denied 29 NY3d 1090 [2017]; People v Gonzalez, 115 AD2d 899, 901 [1985], appeal dismissed 68 NY2d 995 [1986]).
However, based upon a review of the entire record, we are satisfied that this error was harmless as the evidence demonstrated that defendant's guilt was overwhelming and there was no reasonable possibility that the error affected the outcome of the trial. We are even more confidant of this conclusion in light of the fact that County Court gave curative instructions to the jury on numerous occasions — including during jury selection, at the commencement of the trial and during final jury instructions — and especially considering that the jury was aware that defendant was already incarcerated (see People v Bosket, 216 AD2d 791, 793 [1995]; People v Brown, 176 AD2d 408, 408 [1991], lv denied 79 NY2d 853 [1992]; People v Wong, 163 AD2d 738, 739 [1990], lv denied 76 NY2d 992 [1990]).
Defendant next contends that prospective juror No. 6 — who had a previous romantic relationship with one of the correction officers — should have been disqualified during jury selection. This contention is unpreserved, as defendant did not challenge the selection of the prospective juror either presumptively or for cause (see People v Boddie, 126 AD3d 1129, 1131 [2015], lv denied 26 NY3d 1085 [2015]; People v Bruno, 63 AD3d 1297, 1299 [2009], lv denied 13 NY3d 858 [2009]).
Defendant finally contends that his prison term should be reduced in the interest of justice as the statute was amended to shorten the length of the maximum term. "It is well settled that a sentence that falls within the permissible statutory ranges will not be disturbed unless it can be shown that the sentencing court abused its discretion or that extraordinary circumstances exist warranting a modification in the interest of justice" (People v Walker, 191 AD3d 1154, 1160 [2021] [internal quotation marks and citations omitted], lv denied 37 NY3d 961 [2021]). Here, the sentence fell within the permissible statutory range at the time of defendant's conviction. As County Court took into consideration defendant's lengthy criminal history and the nature of the crime committed, we discern no abuse of County Court's discretion or extraordinary circumstances warranting a reduction of the sentence in the interest of justice (see People v Burns, 188 AD3d 1438, 1443 [2020], lvs denied 36 NY3d 1055, 1060 [2021]; People [*5]v Porter, 184 AD3d 1014, 1020 [2020], lv denied 35 NY3d 1069 [2020]).
Garry, P.J., Clark, Aarons and Colangelo, JJ., concur.
ORDERED that the judgment is affirmed.



Footnotes

Footnote 1: By legislation effective August 2, 2021, this statute, as well as other statutes, changed the reference of "inmate" to "incarcerated individual" (L 2021, ch 322, § 106).