People v Burwell (2020 NY Slip Op 02205)





People v Burwell


2020 NY Slip Op 02205


Decided on April 9, 2020


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: April 9, 2020

111255

[*1]The People of the State of New York, Respondent,
v
Asha Burwell, Appellant.

Calendar Date: February 19, 2020

Before: Garry, P.J., Clark, Devine, Pritzker and Colangelo, JJ.


Frederick K. Brewington, Hempstead, for appellant.
P. David Soares, District Attorney, Albany (Vincent Stark of counsel), for respondent.



Pritzker, J.
Appeal from a judgment of the Supreme Court (McDonough, J.), rendered June 16, 2017 in Albany County, upon a verdict convicting defendant of the crime of falsely reporting an incident in the third degree (two counts).
In 2016, defendant was charged in an 11-count indictment with assault in the third degree, harassment in the second degree and four counts of falsely reporting an incident in the third degree for her involvement in an altercation and its aftereffects that occurred on a city bus bound for the State University of New York at Albany (hereinafter SUNY Albany) campus. The indictment alleged that defendant, knowing the information to be false, reported, via an emergency 911 call, that "she was 'jumped' on a bus by a group of males, that it was a racial crime, and that she was struck by boys and called a 'nigger'" (count 4).[FN1] The indictment also set forth that defendant, knowing the information to be false, circulated — via social media and through an appearance at an event on the SUNY Albany campus — an allegation that she was the victim of a racially-motivated assault on a bus (count 7). After a jury trial, defendant was convicted of two counts of falsely reporting an incident in the third degree (counts 4 and 7). Defendant moved to dismiss the indictment and/or set aside the verdict pursuant to CPL 330.30 (1), alleging, among other things, that count 7 impermissibly infringed upon her First Amendment right of free speech. At sentencing, the Supreme Court denied the motion in its entirety and thereafter sentenced defendant to concurrent terms of three years of probation on each count, assessed a fine and ordered community service. Defendant appeals.
Defendant contends that the verdict is not supported by legally sufficient evidence and is against the weight of the evidence. "In reviewing a legal sufficiency claim, [this Court must] view the evidence in the light most favorable to the People and evaluate whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial and as a matter of law satisfy the proof and burden requirements for every element of the crime[s] charged" (People v Haynes, 177 AD3d 1194, 1195 [2019] [internal quotation marks and citations omitted], lv denied 34 NY3d 1128 [2020]; see People v Colon, 177 AD3d 1086, 1087 [2019]). In contrast, "[t]o determine whether a verdict is against the weight of the evidence, this Court must first decide whether, based on all the credible evidence, a different finding would not have been unreasonable, and [if not] then, viewing the evidence in a neutral light and deferring to the jury's credibility assessments, weigh the relative probative force of the conflicting testimony and the relative strength of the conflicting inferences that may be drawn from the testimony" (People v Tromans, 177 AD3d 1103, 1103-1104 [2019] [internal quotation marks and citations omitted]; see People v Saunders, 176 AD3d 1384, 1385-1386 [2019]). As relevant here, "[a] person is guilty of falsely reporting an incident in the third degree when, knowing the information reported, conveyed or circulated to be false or baseless, he or she . . . [g]ratuitously reports to a law enforcement officer or agency . . . false information relating to an actual offense or incident" (Penal Law § 240.50 [3] [c]) or "[i]nitiates or circulates a false report . . . of an alleged occurrence . . . of a crime . . . under circumstances in which it is not unlikely that public alarm or inconvenience will result" (Penal Law § 240.50 [1]).
Testimony of the People's witnesses at trial revealed that, on the night of the incident, the route number 11 bus operated by the Capital District Transportation Authority (hereinafter CDTA) was travelling towards SUNY Albany at approximately 1:00 a.m., and the passengers on the bus were almost exclusively SUNY Albany students. Testimony revealed that a verbal altercation arose when defendant requested that a passenger stop singing in exchange for a sandwich and a heated conversation regarding differential treatment on the basis of race ensued between defendant and several passengers. The verbal altercation escalated when defendant and her friends rose from their seats and approached a girl seated in the back of the bus. The evidence demonstrates that a physical altercation between two girls — Ariel Agudio, one of defendant's friends, and a passenger — resulted. Multiple videos depicting the incident were admitted into evidence. One of these videos consists of footage gathered from eight cameras and three microphones on the bus. Although the bus cameras depict the incident from various angles, only portions of the incident were actually captured and the audio of the incident is largely undecipherable, with the exception of ambient background noise and occasional words and phrases. None of the decipherable words was the "N-word." Video footage of the incident recorded by four individuals on the bus was also admitted at trial, each depicting small portions of the incident. Although the audio is slightly better than that of the bus videos, it is not possible to clearly discern every word that was said during the incident. Again, of the words and phrases that can be deciphered in these videos, none was the "N-word." As established by this video footage and the testimony, once the physical altercation began, several passengers intervened, resulting in defendant, her friends and other passengers being pushed and pulled and Agudio's clip-in hair extensions being torn from her head.
Approximately 18 SUNY Albany students testified about the incident, some of whom were directly involved and others were merely observers. One of these students, Mary Glisson, testified that she was sitting in the back of the bus singing "99 Bottles of Beer on the Wall" and that her singing annoyed defendant and two of her friends — one of whom offered to give her a sandwich if she would "shut up." Glisson testified that a friend of hers yelled, "you're f***ing ignorant, get a job" to the group of women who offered the sandwich. Thereafter, Glisson recalls her friend getting punched in the face, though she did not see by whom, and that, during the incident, she heard the term "white ignorant bitch." Glisson also testified that, preceding the altercation, defendant and her friends made statements about Glisson's ability to sing loudly and annoyingly as a white woman and their inability to object to it as black women. Mark Pronovost, who was also present during the incident, testified that he engaged in a conversation about race with defendant and her friends during the verbal argument, prior to the physical altercation. Pronovost explained that he attempted to discern the substance of the verbal argument and one girl stated that it was a "black issue." Pronovost testified that he did not hear any racial terms used during the incident. Gabrielle Camacho, who was also present during the incident, testified that, upon hearing a discussion regarding "ignorant bitches," she cut defendant and her friends off by stating, "[A]re you f***ing kidding me, you're ignorant, shut the f*** up and get a job." Thereafter, Agudio stood up, approached Camacho and the physical altercation ensued. Camacho testified that she did not hear any racial slurs. The majority of the remaining SUNY Albany students who testified stated that they did not witness any males striking females and that they did not hear the "N-word" or other racial slurs used. However, two witnesses did testify to hearing the word "whale" and another witness testified to hearing the word "ratchet." One witness testified that he did not hear any racial slurs, but, in the days after the incident, he "heard" others saying that they may have heard the "N-word."
Lisa Johnson, a 911 dispatcher with the Albany County Sheriff's office, testified that defendant called 911 following the incident and stated, "I'd like to report the fact that me and my friends were just jumped on a bus for being black." Defendant told Johnson that she and her friends were on a bus going to SUNY Albany. Due to confusion as to where the incident occurred, defendant's call was transferred to police for the City of Albany. An employee of the City of Albany testified that, after she received defendant's call, defendant identified herself and stated that "me and my friends were jumped on a bus because we're black." Defendant continued on to say, "These girls . . . they were calling us the 'N' word and hitting us and so were guys[,] and the bus driver didn't do anything about it until we got to campus, and he stopped the bus and still . . . guys continued to hit us in the face." Benjamin Nagy, an investigator with the SUNY Albany police, testified that he conducted a recorded interview with defendant following the incident.[FN2] During her interview, defendant informed Nagy that she heard the "N-word" twice during the incident and that defendant was the only individual to provide him with information that that word was used. An inspector with the SUNY Albany police also testified, explaining that, in the course of his investigation, an individual who was on the bus stated that he did not hear the "N-word," but that other people said they had heard it.
The People also admitted various statements, or tweets, made by defendant on her Twitter account in the days following the bus incident. The first tweets following the incident read, "I just got jumped on a bus while people hit us and called us the 'n' word and NO ONE helped us." Defendant also stated, among other things, via Twitter, "I can't believe I just experienced what it's like to be beaten because of the color of my skin," and "these were my fellow classmates[,] people that attend MY school."
Defendant testified as to the incident. In that regard, defendant recounted that, while sitting on the bus, she noticed a girl singing loudly behind her and that she offered the girl her sandwich in an attempt to stop the singing. Defendant testified that she heard the "B" word and Agudio informed her that a girl had referred to them as "ratchet bitches," which defendant testified offended her as she understood the word to mean "ghetto." She also testified that the phrase is commonly associated with black women or a person who is inferior. Thereafter, Agudio engaged in dialogue with a girl in the back of the bus; defendant heard people telling Agudio to "shut the 'F' up." Defendant testified that she then expressed to bystanders the racial distinction she perceived between people's reaction — or lack thereof — to a girl loudly singing and their reaction to black women yelling loudly. Defendant testified that a male then referred to Agudio as a "whale bitch," which she understood to mean something that is not human — a derogatory term for bigger women. Defendant testified that following this dialogue, she stood up from her seat; she then felt her hair being pulled and was hit in the face. Defendant indicated that she began to fall over and attempted to get herself up; she eventually was pushed out of the commotion. She observed Agudio bent over a bus seat and that males and females were ripping her hair out. Defendant testified that she witnessed a man push Agudio down as others laughed. As defendant attempted to help Agudio, she was again pushed out of the commotion; she then felt someone grab her from behind and she turned to see a male pulling her backwards. Defendant testified that she was continuously pulled back by her arm and jacket, but no one was pulling back the people who were ripping out Agudio's hair. Defendant testified that she heard a male voice say the "N-word" twice. Defendant explained that, after she got off the bus, she called 911 pursuant to the SUNY Albany crime policy. Defendant also tweeted about the incident. Defendant testified that she characterized the incident as racially motivated because no one would have used the "N-word or ratchet but for her status as a black woman. She stated that she reported the incident because she was injured and afraid; the altercation should not have happened and she did not want to attend school with people "like that."
The verdict is supported by legally sufficient evidence and is not against the weight of the evidence. In that regard, the trial evidence established that a verbal altercation arose that led to a heated conversation regarding differential treatment based on race. A verbal altercation ensued between Agudio and a passenger that resulted in defendant, her friends and other passengers being pushed and pulled and Agudio's hair extensions being pulled out. The evidence is inconclusive as to whether the "N-word" was uttered on the bus; however, the testimony and video footage indicate that the word was neither heard nor spoken. Defendant thereafter reported to the police that she and her friends were jumped on a bus on account of their race; defendant reported that men and women participated in the assault and that the passengers called defendant the "N-word." The evidence also demonstrates that defendant posted on social media that she was jumped on a bus, called the "N-word" and was beaten because of her skin color. Based on the foregoing proof adduced at trial, we find that legally sufficient evidence exists to support both counts of falsely reporting an incident in the third degree (see People v Haynes, 177 AD3d at 1195; People v Colon, 177 AD3d at 1088). As to the weight of the evidence, although a different verdict would not have been unreasonable inasmuch as the jury could have credited defendant's version of events, we find that the jury's verdict is supported by the weight of the evidence (see People v Waheed, 176 AD3d 1510, 1512 [2019], lv denied 34 NY3d 1133 [2020]; People v Lentini, 163 AD3d 1052, 1053-1054 [2018]). Deferring to the jury's credibility determinations, the evidence supporting defendant's convictions rests upon multiple sources that demonstrate that defendant knew she was not jumped on a bus by boys and girls as part of a racially-motivated assault and that she nonetheless falsely reported to a 911 dispatcher and posted on social media that she was beaten because of the color of her skin.
Nevertheless, because we agree with defendant's contention that Penal Law § 240.50 (1)[FN3] as applied here is unconstitutional, the judgment of conviction as to count 7 must be reversed. Specifically, defendant argues that the "public alarm" standard in Penal Law § 240.50 (1) is insufficient to criminalize public, noncommercial speech, even if false.[FN4] To begin, inasmuch as this statute criminalizes a certain type of speech,[FN5] namely false speech, the restrictions on speech are content-based, rather than time, place or manner limitations. To that end, content-based restrictions are "presumed invalid, and . . . the Government bear[s] the burden of showing their constitutionality" (Ashcroft v American Civil Liberties Union, 542 US 656, 660 [2004] [internal citation omitted]). Absent certain historical categories which do not apply here (see United States v Alvarez, 567 US 709, 717 [2012]), even false speech is considered protected (see id. at 722) and, in that context, content-based restrictions are subject to "the most exacting scrutiny" (id. at 724 [internal quotation marks and citation omitted]). Under this exacting, or strict, scrutiny standard, governmental regulation of speech "is enforceable only if it is the least restrictive means for serving a compelling government interest" (Town of Delaware v Leifer, 34 NY3d 234, 244 [2019]). "The First Amendment requires that the [g]overnment's chosen restriction on the speech at issue be actually necessary to achieve its interest. There must be a direct causal link between the restriction imposed and the injury to be prevented" (United States v Alvarez, 567 US at 725 [internal quotation marks and citation omitted]).
We have no trouble finding that Penal Law § 240.50 (1) is designed to address at least two compelling governmental interests — preventing public alarm and the waste of public resources that may result from police investigations predicated on false reports.[FN6] However, when examining whether the statute uses the least restrictive means for serving those purposes, as applied to defendant, we reach the conclusion that the statute is impermissibly broad (see United States v Alvarez, 567 US at 722-723; see generally Louis W. Tompros, Richard A. Crudo, Alexis Pfeiffer, Rahel Boghossian, The Constitutionality of Criminalizing False Speech Made on Social Networking Sites in a Post-Alvarez, Social Media-Obsessed World, 31 Harv JL & Tech 65 [2017]). More particularly, neither general concern nor the Twitter storm that ensued following defendant posting the false tweets are the type of "public alarm or inconvenience" that permits defendant's tweets to escape protection under the First Amendment (Penal Law § 240.50 [1]),[FN7] and, therefore, the speech at issue here may not be criminalized.
To that end, although it was "not unlikely" that defendant's false tweets about a racial assault at a state university would cause public alarm (Penal Law § 240.50 [1]), what level of public alarm rises to the level of criminal liability? Indeed, United States v Alvarez (567 US at 734 [Breyer, J., concurring]) informs us that criminalizing false speech requires either proof of specific harm to identifiable victims or a great likelihood of harm. Certainly, general concern by those reading defendant's tweets does not rise to that level, nor does the proof adduced at trial, which established that defendant's tweets were "retweeted" a significant number of times. In fact, because these "retweets" led to nothing more than a charged online discussion about whether a racially motivated assault did in fact occur, which falls far short of meeting the standard set forth in United States v Alvarez (567 US at 734 [Breyer, J., concurring]), we reach the inescapable conclusion that Penal Law § 240.50 (1), as applied to defendant's conduct, is unconstitutional.
Indeed, Penal Law § 240.50 (1) is a "[b]lunt [t]ool for [c]ombating [f]alse [s]peech" (Louis W. Tompros, Richard A. Crudo, Alexis Pfeiffer, Rahel Boghossian, The Constitutionality of Criminalizing False Speech Made on Social Networking Sites in a Post-Alvarez, Social Media-Obsessed World, 31 Harv JL & Tech 65, 65 [2017]) and its "alarming breadth" (People v Marquan M., 24 NY3d at 9 [internal quotation marks and citation omitted]) is especially on display with respect to social media.[FN8] Notably, "[t]he remedy for speech that is false is speech that is true" (United States v Alvarez, 567 US at 727) and "social media platforms are information-disseminating fora. By the very nature of social media, falsehoods can quickly and effectively be countered by truth, making the criminalizing of false speech on social media not 'actually necessary' to prevent alarm and inconvenience" (Louis W. Tompros, Richard A. Crudo, Alexis Pfeiffer, Rahel Boghossian, The Constitutionality of Criminalizing False Speech Made on Social Networking Sites in a Post-Alvarez, Social Media-Obsessed World, 31 Harv JL & Tech 65, 106 [2017]). This could not be more apparent here, where defendant's false tweets were largely debunked through counter speech; thus, criminalizing her speech by way of Penal Law § 240.50 (1) was not actually necessary to prevent public alarm and inconvenience (see Louis W. Tompros, Richard A. Crudo, Alexis Pfeiffer, Rahel Boghossian, The Constitutionality of Criminalizing False Speech Made on Social Networking Sites in a Post-Alvarez, Social Media-Obsessed World, 31 Harv JL & Tech 65, 106 [2017]).
Based upon this conclusion, defendant's remaining contentions as to count 7 are rendered academic. Defendant's remaining argument, that her conviction as to count 4 is repugnant to her acquittal of count 5, is not preserved because defendant failed to raise this claim prior to Supreme Court's discharge of the jury (see People v Maeweather, 172 AD3d 1646, 1649 [2019], lv denied 34 NY3d 1017 [2019]; People v Keener, 152 AD3d 1073, 1074-1075 [2017]).
Garry, P.J., Clark, Devine and Colangelo, JJ., concur.
ORDERED that the judgment is modified, on the law, by reversing defendant's conviction of falsely reporting an incident in the third degree under count 7 of the indictment; said count dismissed and the sentence imposed thereon vacated; and, as so modified, affirmed.



Footnotes

Footnote 1: It is noted that, at trial, the People moved to dismiss counts 2, 3, 6 and 7 of the indictment. Accordingly, Supreme Court renumbered the indictment. As relevant here, the court renumbered count 8 as count 4 and count 11 as count 7.

Footnote 2: The recorded interview was admitted into evidence.

Footnote 3: As noted supra, pursuant to Penal Law § 240.50 (1), "[a] person is guilty of falsely reporting an incident in the third degree when, knowing the information reported, conveyed or circulated to be false or baseless, he or she initiates or circulates a false report or warning of an alleged occurrence
. . . of a crime . . . under circumstances in which it is not unlikely that public alarm or inconvenience will result."

Footnote 4: Defendant concomitantly argues that, even if her tweets were knowingly false, they are nevertheless protected by the First Amendment because there was no proof that the impact of such speech presented a clear and present danger to the public (see Brandenburg v Ohio, 395 US 444, 447 [1969]). Because defendant is being prosecuted on the basis of false speech, rather than speech involving subversive political advocacy or speech designed to incite a riot (compare Penal Law § 240.08; People v Upshaw, 190 Misc 2d 704, 706-709 [NY City Crim Ct 2002]), Brandenburg and its progeny do not apply (compare United States v Alvarez, 567 US 709, 722 [2012]; see generally Tom Hentoff, Note, Speech, Harm, and Self-Government: Understanding the Ambit of the Clear and Present Danger Test, 91 Colum L Rev 1453, 1459 n 42 [1991]).

Footnote 5: Defendant's tweets constitute speech rather than conduct (see generally People v Marquan M., 24 NY3d 1 [2014]; compare People v Shack, 86 NY2d 529, 535 [1995]).

Footnote 6: In fact, other subsections of Penal Law § 240.50, as well as other sections of Penal Law article 240, specifically address this type of harm (see e.g. Penal Law §§ 240.05, 240.20, 240.61).

Footnote 7: We note that, in New York, freedom of speech often enjoys even broader protection than under the federal counterpart, which defines the least amount of protection that can pass constitutional muster (see NY Const, art I, § 8; see generally Immuno AG. v Moor-Jankowski, 77 NY2d 235, 249 [1991], cert denied 500 US 954 [1991]).

Footnote 8: Overbroad enforcement of speech restrictions may also result in a chilling effect as to political speech where opinion and facts often collide and "those who are unpopular may fear that the government will use that weapon selectively" against them (United States v Alvarez, 567 US at 734 [Breyer, J., concurring]).