People v Agudio (2021 NY Slip Op 03224)





People v Agudio


2021 NY Slip Op 03224


Decided on May 20, 2021


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:May 20, 2021

111292
[*1]The People of the State of New York, Respondent,
v
Ariel Agudio, Appellant.

Calendar Date:February 8, 2021

Before:Egan Jr., J.P., Clark, Aarons, Pritzker and Colangelo, JJ.

Law Office of Mark S. Mishler, PC, Albany (Mark S. Mishler of counsel), for appellant.
P. David Soares, District Attorney, Albany (Vincent Stark of counsel), for respondent.



Colangelo, J.
Appeal from a judgment of the Supreme Court (McDonough, J.), rendered June 16, 2017 in Albany County, upon a verdict convicting defendant of the crime of falsely reporting an incident in the third degree (two counts).
In April 2016, defendant was charged in an 11-count indictment with one count of assault in the third degree, three counts of attempted assault in the third degree, three counts of harassment in the second degree and four counts of falsely reporting an incident in the third degree for her involvement in, and subsequent reporting of, an altercation that occurred on a city bus bound for the State University of New York at Albany (hereinafter SUNY Albany) campus. After four counts were dismissed, the trial proceeded on the remaining counts, some of which were renumbered. As relevant here, the renumbered indictment charged defendant, in counts 4 and 7, with falsely reporting an incident in the third degree. Specifically, count 4 alleged that defendant, knowing the information to be false, reported, via an emergency 911 call, that "she was 'jumped' on a bus by a group of males, that it was a racial crime, and that she was struck by boys and called [the] '[N-word]'" (hereinafter the racial slur). Count 7 alleged that defendant, knowing the information to be false, circulated an allegation, via social media and through an appearance at an event on the SUNY Albany campus, that she was the victim of a racially-motivated assault on a bus. Following a jury trial, defendant and codefendant Asha Burwell were convicted of counts 4 and 7 and acquitted of the remaining charges.[FN1] Defendant joined in Burwell's motion to dismiss and/or set aside the verdict pursuant to CPL 330.30 (1), alleging, among other things, that the verdict was repugnant as a matter of law and that count 7 impermissibly infringed upon her First Amendment right of free speech. Supreme Court denied the motion in its entirety and sentenced defendant to concurrent terms of three years of probation on each conviction, assessed a fine and ordered community service. Defendant appeals.
Defendant contends that the verdict is not supported by legally sufficient evidence and is against the weight of the evidence. "When reviewing the legal sufficiency of the evidence, this Court must view the evidence in the light most favorable to the People and evaluate whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial and as a matter of law satisfy the proof and burden requirements for every element of the crimes charged" (People v Rudge, 185 AD3d 1214, 1215 [2020] [internal quotation marks and citations omitted], lv denied 35 NY3d 1070 [2020]; see People v Hilton, 185 AD3d 1147, 1148 [2020], lv denied 35 NY3d 1095 [2020]). In contrast, when conducting a weight of the evidence review, we must "view the evidence in a neutral light and determine first whether a [*2]different verdict would have been unreasonable and, if not, then weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Caden N., 189 AD3d 84, 89 [2020] [internal quotation marks, brackets and citations omitted], lv denied 36 NY3d 1050 [2021]; see People v Callahan, 186 AD3d 943, 943-944 [2020]; People v McCabe, 182 AD3d 772, 773 [2020]; People v McCoy, 169 AD3d 1260, 1261-1262 [2019], lv denied 33 NY3d 1033 [2019]). As relevant here, "[a] person is guilty of falsely reporting an incident in the third degree when, knowing the information reported, conveyed or circulated to be false or baseless, he or she . . . [i]nitiates or circulates a false report . . . of an alleged occurrence
. . . of a crime . . . under circumstances in which it is not unlikely that public alarm or inconvenience will result" (Penal Law § 240.50 [1]) or "[g]ratuitously reports to a law enforcement officer or agency . . . false information relating to an actual offense or incident" (Penal Law § 240.50 [3] [c]).
The factual background is substantially similar to that set forth in our decision in People v Burwell (183 AD3d 173, 176-179 [2020], lv denied 35 NY3d 1043 [2020]). The trial testimony of the People's witnesses revealed that, at approximately 1:00 a.m. on the night of the incident, defendant, Burwell and Alexis Briggs [FN2] were on the route No. 11 bus that was traveling from the downtown area of the City of Albany towards the SUNY Albany campus. Most of the passengers were SUNY Albany students. A verbal altercation arose when defendant was unsuccessful in her attempt to stop Mary Glisson, a rear seat passenger that boarded the bus after consuming two beers, from singing "99 Bottles of Beer on the Wall." Testimony revealed that defendant stood up and yelled at Glisson to be quiet, stating, "I'm from Long Island, I can f*** you up." Glisson testified that her friend, Gabrielle Camacho, yelled, "you're f***ing ignorant, get a job" to defendant, Burwell and Briggs, and that, thereafter, Camacho was punched in the face. Glisson further testified that, during the incident, she heard the term "white ignorant bitch." Glisson testified that she was hit, but could not identify who hit her, and she sustained injuries to her hands and knuckles. Glisson recounted that, prior to the physical altercation, defendant, Burwell and Briggs made comments about Glisson's ability, as a white woman, to sing loudly and annoyingly and their inability, as black women, to object to the singing. Benta Nkromah, also present, testified that defendant and Burwell attacked Glisson and that she heard defendant say "stupid white bitches" before the attack. Nkromah testified that she did not hear any other racial comments.
Bianca Deleon, who was sitting in the rear of the bus, testified that defendant, Burwell and Briggs [*3]called Glisson and the other rear passengers "white bitch, bitches." Mark Pronovost testified that he attempted to ascertain the basis of the heated verbal exchanges between the different groups on the bus and was told that it was a "black issue." Pronovost was among the passengers who asked defendant to sit down when she became visibly annoyed by Glisson's singing. He recounted that defendant responded by saying, "[B]ecause I'm black . . . I can't say anything." Camacho testified that she heard the comment "ignorant bitches" and told defendant, Burwell and Briggs "are you f***ing kidding me, you're ignorant, shut the f*** up and get a job." Deleon testified that after Camacho's comment, defendant, Burwell and Briggs stood up, went to the rear of the bus and initiated the physical altercation. Abdul Keiateh and Nathan Felon testified that they did not hear the racial slur, did not hear other racial epithets and did not see males striking females during the altercation. Russell Norowitz testified that the physical altercation was initiated by a group of girls who were not singing. He testified that he did not hear the racial slur or any racial epithets and did not witness any males striking females.
David Ray, a 911 dispatcher with the Town of Colonie Police Department, testified that defendant called 911 following the incident and, before he answered the call, he heard defendant say, "I was beating the shit out of that bitch . . . I had three of them down." After Ray answered the call, defendant stated, "I just got jumped on a bus and no one did anything." Defendant stated, "Me and my three friends got jumped. It was a racial crime and they were calling us [the racial slur] and all this stuff. And if someone doesn't come and take this down or something, I am going to call the news because it was ridiculous. They ripped out all of our hair and everything." After Ray got the call, the call was transferred to several police agencies — the City of Albany Police Department, the SUNY Albany police and the Albany County Sheriff's Office. Derrick Oxintine Jr., a 911 dispatcher, testified that, upon receiving defendant's call, defendant provided her location and then stated aloud to one of her friends, "I know I have a black eye, but I think it's funny how I had three bitches down." When speaking to someone with the SUNY Albany police, defendant essentially reiterated the report that she had made to Ray, adding that "[t]he cops weren't called because we're black, so the cops weren't called."
David Chase, a 911 dispatcher with the Albany County Sheriff's Office, testified that defendant reported to him that she "got jumped on a bus in Albany." Joseph Leigh, a 911 dispatcher with the City of Albany Police Department, testified that defendant reported, "I got jumped on a bus" and then stated "all three of my friends were against 10 people and . . . it was a racially-fueled crime, we were three black girls jumped by like 20 white people, so [*4]I think it's important that we call." Tracy Sandoval, a police officer with the City of Albany Police Department, testified that she responded to defendant's apartment following the incident and was told by defendant, Burwell and Briggs that "they were punched around the head and body by the white males and white females on the bus and called . . . [the racial slur] and whales." Benjamin Nagy, an investigator with the SUNY Albany police, testified that he conducted a recorded interview with defendant following the incident and took a sworn written statement from defendant, both of which were admitted into evidence. According to the written statement, defendant was told by her friends that they were called the racial slur. Paul Burlingame, an inspector with the SUNY Albany police, testified that, in the course of his investigation, a passenger on the bus stated that he did not hear the racial slur but other people said they heard it.
Defendant testified that, while sitting on the bus, she heard a girl singing loudly in the rear of the bus and Burwell offered the girl a sandwich in an attempt to stop the singing. Defendant recounted that she heard the girl call her and her friends "ratchet bitches," which means "ghetto" and a phrase used to disparage black women. Defendant testified that she stood up and engaged in a "confrontational argument" with the girl and then sat back down after a bunch of guys told her to "shut up" and "sit down." Defendant testified that she believed that she was told to shut up because she was black, since nothing was said to the white girl singing loudly. Defendant testified that before she sat down, a male shouted "whale" and she confronted him too. Defendant recounted that, after she sat down, she heard loud noises and screaming in the back of the bus and saw that her friends were no longer seated. She turned to see the girl who was singing and other rear passengers fighting her friends. Defendant testified that she went to defend her friends and became the target of a physical altercation that was in progress between the two groups of girls. Defendant testified that a crowd of people pushed her forward and she lost control and fell into a seat. While kneeling in the seat, she was repeatedly punched and, at the same time, felt her hair extensions and some of her natural hair being pulled from her head by the four girls. Defendant also testified that she believed that guys were involved. Defendant testified that her friends told her that they heard the racial slur used on the bus. Defendant testified that she believed that guys were involved in the altercation because "they were all around me and touching me." Defendant admitted that when she stated to police that she was being repeatedly stuck by males, it was not true. Defendant testified that she tweeted and retweeted about the incident, including retweets of Burwell's tweets that essentially stated that she was a victim of a racially motivated assault [*5]on a bus and no one helped them. Multiple videos depicting the incident were captured by cameras and microphones on the bus and footage recorded by four individuals on the bus. These videos were admitted into evidence at trial and, of the words that were decipherable, none was the racial slur.
The evidence at trial established that defendant was annoyed by singing on the bus and initiated a verbal exchange that erupted into a physical altercation. Although defendant testified that the racial slur was spoken, the remaining testimony and the video footage indicate that the racial slur was neither heard nor spoken. Defendant reported to police that she and her friends were jumped on a bus on account of their race, that men and women participated in the assault and that passengers called her the racial slur. The evidence further demonstrates that defendant posted on social media the account of the incident that she gave to police. Based upon the foregoing proof adduced at trial, we find that legally sufficient evidence exists to support both counts of falsely reporting an incident in the third degree (see People v Haynes, 177 AD3d 1194, 1195 [2019], lv denied 34 NY3d 1128 [2020]; People v Colon, 177 AD3d 1086, 1088 [2019]). As to the weight of the evidence, although a different verdict would not have been unreasonable, as the jury could have credited defendant's version of events, we find that the jury's verdict is supported by the weight of the evidence (see People v Waheed, 176 AD3d 1510, 1512 [2019], lv denied 34 NY3d 1133 [2020]; People v Lentini, 163 AD3d 1052, 1053-1054 [2018]).
Nevertheless, in People v Burwell (183 AD3d at 180-183), we held that Penal Law § 240.50 (1), the basis of count 7, was unconstitutional as applied to Burwell's posting of false tweets. As the content of defendant's tweets are substantially the same as Burwell's tweets, and in light of the People's concession that defendant's conviction on count 7 requires reversal under the First Amendment, we modify the judgment by reversing defendant's conviction on said count. Based upon this conclusion, defendant's remaining contentions as to count 7 are rendered academic. Defendant's remaining argument that her conviction as to count 4 is repugnant to her acquittal of count 5 was not preserved for our review through an appropriate timely objection before the jury was discharged (see People v Howard, 175 AD3d 1620, 1621 [2019], lv denied 34 NY3d 981 [2019]; People v Maeweather, 172 AD3d 1646, 1649 [2019], lv denied 34 NY3d 1017 [2019]).
Egan Jr., J.P., Clark, Aarons and Pritzker, JJ., concur.
ORDERED that the judgment is modified, on the law, by reversing defendant's conviction of falsely reporting an incident in the third degree under count 7 of the indictment; said count dismissed and the sentence imposed thereon vacated; and, as so modified, affirmed.



Footnotes

Footnote 1: This Court affirmed Burwell's conviction on count 4 and reversed her conviction on count 7 (People v Burwell, 183 AD3d 173 [2020], lv denied 35 NY3d 1043 [2020]).

Footnote 2: Briggs was indicted along with defendant and Burwell but pleaded guilty before trial.