People v Lee (2020 NY Slip Op 03049)





People v Lee


2020 NY Slip Op 03049


Decided on May 28, 2020


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: May 28, 2020

109301

[*1]The People of the State of New York, Respondent,
v
Andre D. Lee, Appellant.

Calendar Date: March 26, 2020

Before: Garry, P.J., Clark, Aarons, Pritzker and Reynolds Fitzgerald, JJ.


Catherine A. Barber, Guilderland, for appellant.
Palmer J. Pelella, Special Prosecutor, Owego, for respondent.



Garry, P.J.
Appeal from a judgment of the County Court of Broome County (Cawley Jr., J)., rendered February 21, 2017, upon a verdict convicting defendant of the crimes of murder in the second degree, assault in the second degree, criminal possession of a weapon in the second degree (two counts) and criminal possession of a weapon in the third degree.
On July 4, 2014, defendant hit Seth West in the head with a liquor bottle and, shortly thereafter, shot Scott Wright in the abdomen, causing Wright's death. He was charged with murder in the second degree, assault in the second degree, criminal possession of a weapon in the second degree (two counts) and criminal possession of a weapon in the third degree. Following a jury trial, he was convicted as charged and sentenced to consecutive prison terms of 25 years to life on the murder conviction and two years on the assault conviction, followed by three years of postrelease supervision, and to lesser concurrent terms on the remaining convictions. Defendant appeals.
Defendant contends that the evidence was legally insufficient to establish his intent to cause Wright's death as an element of his conviction for murder in the second degree, and his intent to use a firearm unlawfully against Wright as an element of his conviction for criminal possession of a weapon in the second degree. He further contends that his convictions on these counts are against the weight of the evidence because the People did not establish that he intended to shoot Wright and did not prove that defendant's weapon did not discharge accidentally.
The People's witnesses included numerous individuals who attended a community Independence Day celebration in the parking lot of an apartment complex in the City of Binghamton, Broome County. Their testimony established that the party was uneventful until defendant and several acquaintances began teasing one another, in what was initially a good-natured way, about T-shirts that defendant and others were wearing. However, the tone of the encounter changed when West, whom defendant did not know, joined in the teasing. Defendant, who had been drinking throughout the party from a liquor bottle that he was carrying, took offense at something West said. The two argued and defendant told West to leave, but West refused to do so. A few minutes later, while West was watching fireworks, defendant struck West in the side of the head with the liquor bottle, which broke, partially severing West's ear. West and defendant then had a fistfight. Other attendees separated them, and West and several other guests went into a nearby apartment to tend to West's ear.[FN1] Defendant left the party saying, according to some witnesses, that he would be back.
A few minutes later, defendant returned, wearing a different shirt. He asked a group of partygoers — who included Brian Alexander, Alexander's sister and Wright's sister — whether anyone "ha[d] a problem with what just happened." Alexander responded that he did have a problem with it. Defendant then pulled a gun out of his pants, cocked it and pointed it steadily at Alexander. According to several witnesses, defendant then told Alexander that he would not shoot him, since they were friends; one witness said that defendant said that Alexander's sister was "lucky [defendant] liked [her] brother." Some witnesses testified that they were not afraid because they did not think defendant would shoot anyone, while other witnesses ran away or hid behind nearby cars. After defendant told Alexander that he would not shoot him, Alexander went into the nearby apartment where West had gone.
When Wright, who was inside the apartment, learned that defendant was displaying a gun, he became concerned about his sister and went outside to check on her.[FN2] Defendant was standing near the outer door, at the bottom of a short flight of steps. After Wright stepped outside, defendant shot him, striking him in the abdomen. There was conflict in the testimony as to the exact sequence of events. Witnesses agreed that Wright had nothing in his hands, was not moving fast and had not yet started down the steps when defendant shot him. However, some guests said that defendant acted almost immediately and that neither he nor Wright spoke, while others said that the two appeared to have a brief conversation, although these witnesses could not hear what was said. Two witnesses said that defendant said, "What?" to Wright just before shooting him. One witness said that defendant said, "So you want to be the tough one," pointed the gun at Wright, cocked it and shot him. Another witness said that defendant turned to Wright as he came out the door and said, "Oh, you want to be the tough guy," that Wright said, "Wait, what?" and that defendant then pulled something out of his pocket, whereupon this witness heard a "big boom" and Wright fell to the ground. This witness said that defendant then said, "See, I told you," before turning around and walking away. Defendant then left the scene; Wright died in the hospital three days later.
A friend of defendant's girlfriend testified that she saw defendant at the girlfriend's house later that evening, mumbling, pacing back and forth and seeming to be upset. At defendant's request, the friend drove defendant to his mother's house nearby, but when defendant saw police cars around the mother's home, he asked the friend to take him back to the girlfriend's home, which she did.
The next morning, police officers searched the girlfriend's home and found defendant hiding in the attic. A search of his mother's home disclosed ammunition in a closet. During an interview with police, defendant acknowledged that he had struck West with the bottle and had argued with Alexander, but initially denied having any involvement with a gun, claiming only that he had heard a gunshot. After several hours, police allowed defendant to speak with his girlfriend. Thereafter, he admitted that he had shot Wright, but claimed that he had not intended to do so, that he returned to the party and displayed the gun only because he wanted a chance for a fair fight, and that the gun discharged accidentally. Defendant directed police to a wooded area where he had hidden the loaded gun and the clothing that he had worn to the party. The gun was test-fired and proved to be operable. Defendant's grand jury testimony was read into evidence at the trial, in which he testified, among other things, that he believed that Alexander had gone into the apartment to summon someone else to fight with him, and repeated his claim that the shooting was accidental.
Following the close of the People's proof, defendant's mother testified on defendant's behalf, saying that defendant had come to her house after she went to bed that evening and that he had gone to a hallway closet where he kept some belongings, changed his shirt and shoes and had then gone out again. She stated that she knew that defendant had a gun and had directed him to remove it from her house, but that she did not know that there was ammunition in the closet.
Defendant testified that he had drunk a third of a bottle of liquor by the early afternoon of the day of the shooting, that he continued to drink heavily throughout the party and that he also smoked synthetic marihuana. He acknowledged that he became angry when West "mock[ed]" him and that he struck West with the liquor bottle. He said that he was angry that other guests did not try to break up the fight when West was winning, but did break it up when defendant was winning, and that he believed that he had been prevented from having a "fair fight" with West. Defendant denied that he had gone to his mother's house to get his gun, claiming that he had been carrying the gun in his pants pocket throughout the day. He stated that he went to his mother's house to change his shirt and shoes, because his shirt had been torn during the fight and he did not want his good sneakers to be damaged. Defendant said that he had no intention of shooting anyone when he returned to the party, claiming that he waved the gun around because he wanted someone to give him another opportunity to fight. He stated that he and Wright did not exchange any words after Wright emerged from the door, that defendant did not intend to shoot Wright and that "the gun went off" unexpectedly in his hand.
Defendant claimed that he was "[n]ot too familiar" with guns, that he had bought the gun a few weeks before for self-protection after giving information to the prosecution in an unrelated murder case, and that he had fired it only once before, aiming into the air when he was "drunk" and "acting stupid." However, he acknowledged that he was familiar with how the trigger and the safeties worked, that he knew the gun was loaded, that he had cocked the gun, putting a live round into it, and that his finger was on the trigger when the gun discharged.
Viewing this evidence in the light most favorable to the People, and given that intent may be inferred from a defendant's actions (see People v Stover, 178 AD3d 1138, 1143 [2019], lv denied 34 NY3d 1163 [2020]), we find that there is a valid line of reasoning and permissible inferences from which a rational jury could conclude that defendant possessed the requisite intent to shoot and kill Wright and to use the gun unlawfully (see Penal Law §§ 125.25 [1]; 265.03 [1] [b]; People v Stover, 178 AD3d at 1143; People v Reese, 166 AD3d 1057, 1060 [2018], lv denied 33 NY3d 953 [2019]). As for defendant's weight of the evidence claim, a different verdict would not have been unreasonable if the jury had credited defendant's testimony that the gun discharged accidentally. Thus, we must "weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony" (People v Bleakley, 69 NY2d 490, 495 [1987] [internal quotation marks and citation omitted]). Resolution of the conflicting testimony was within the jury's province, and deferring to these assessments and viewing the evidence in a neutral light, we find that the verdict is not against the weight of the evidence (see People v Stover, 178 AD3d at 1144; People v King, 124 AD3d 1064, 1065-1066 [2015], lv denied 25 NY3d 1073 [2015]; People v Siler, 288 AD2d 625, 627 [2001], lv denied 97 NY2d 709 [2002]).
Defendant next contends that he was deprived of a fair trial on the charge of murder in the second degree when County Court gave the jury an improper supplemental instruction in response to jury inquiries about the element of intent. "[C]ommon-law principles of procedural fairness generally require the court to furnish the jury with information requested during its deliberations" (People v Taylor, 26 NY3d 217, 224 [2015]), and a trial court further has a statutory obligation to respond to jury requests for clarification made "[a]t any time during [the jury's] deliberation" (CPL 310.30). In response to such an inquiry, the court "must perform the delicate operation of fashioning a response which meaningfully answers the jury's inquiry while at the same time working no prejudice to the defendant" (People v Williamson, 267 AD2d 487, 489 [1999], lvs denied 94 NY2d 882, 886 [2000]; accord People v Miller, 288 AD2d 698, 700 [2001]; see People v Santi, 3 NY3d 234, 248 [2004]; People v Rawlinson, 170 AD3d 1425, 1429 [2019], lv denied 33 NY3d 1107 [2019]). "[T]he court has significant discretion in determining the proper scope and nature of the response" (People v Taylor, 26 NY3d at 224). In analyzing whether that discretion was abused, "[t]he factors to be evaluated are the form of the jury's question, which may have to be clarified before it can be answered, the particular issue of which inquiry is made, the supplemental instruction actually given and the presence or absence of prejudice to the defendant" (People v Malloy, 55 NY2d 296, 302 [1982], cert denied 459 US 847 [1982]; accord People v Taylor, 26 NY3d at 224; see People v Wilson, 90 AD3d 1155, 1156-1157 [2011], lv denied 18 NY3d 963 [2012]).
During deliberations, the jury sent a note requesting, as pertinent here, the "[d]efinition of intent in most layman's terms possible" and asking, "Is the second degree murder charge specific to the killing of Scott Wright or shooting anyone?" County Court reread the expanded instruction on intent that it had previously given and advised the jury that the murder charge was "specific to the killing of Scott Wright." Thereafter, the jury sent a second note reading, "Can we convict if there was intent to kill another?" Defense counsel and the prosecutor initially opined that the answer should be in the negative, but the court stated that it was not certain. Following a recess for research and a discussion with counsel off the record, the court stated that it could not determine whether the jury was asking about the pleadings, transferred intent or mistake of fact. With counsel's agreement, the court asked the jury to provide clarification.
In response to this request, the jury sent a note reading, "The question regarding intent goes to the specific question that Scott Wright was shot — is the murder charge specific to the idea or fact that defendant specifically shot at [Wright] or does the intent go to the fact that he intentionally fired the gun at whoever happened to walk out the door?" After further research and discussion, defense counsel took the position that, because the indictment charged that defendant acted with the intent to cause the death of Wright, the jury should be instructed that it had to determine whether defendant specifically intended to shoot Wright and could not consider whether he intended "to just shoot the next person who walked out the door." The prosecutor disagreed, arguing that the People were not bound by the language of the indictment because the identity of the victim was not an element of second degree murder. Over defense counsel's objection, County Court then advised the jury that the answer to its question whether the murder charge was specific to the idea that defendant "specifically shot at [Wright]" was no, and that the answer to its question whether intent could apply to intentionally firing at the person who happened to walk out the door was yes. The court then gave the jury the definition of murder in the second degree as set out in Penal Law § 125.25 (1), read to the jury language from Penal Law § 15.20 (1) providing that "[a] person is not relieved of criminal liability for conduct because he engages in such conduct under a mistaken belief of fact" and, finally, advised the jury that if it "[found] unanimously that the People [had] proven beyond a reasonable doubt that the defendant intended to cause the death — again, that the defendant intended to cause the death — of another person, and by that intentional conduct he caused the death [of] Scott Wright, that would be a sufficient finding to warrant a verdict of guilty."[FN3] The jury resumed its deliberations and, less than an hour later, returned its verdict of guilty on all counts.
We reject defendant's contention that the supplemental instruction impermissibly altered the theory of the prosecution. As defendant argues, "a jury charge may not constructively amend an indictment by varying the theory of the prosecution" (People v Ardrey, 92 AD3d 967, 970-971 [2012], lvs denied 19 NY3d 861, 865 [2012]). "However, not every fact mentioned in an indictment is essential to establish the defendant's guilt of the crime charged, and thus it is not necessary in every case that the People prove all acts alleged in the indictment when the remaining acts alleged are sufficient to sustain a conviction" (People v Spratley, 144 AD2d 769, 771 [1988] [internal quotation marks, brackets and citations omitted], lv denied 73 NY2d 896 [1989]; accord People v Buanno, 296 AD2d 600, 601 [2002], lv denied 98 NY2d 695 [2002]; see People v Flanders, 25 NY3d 997, 999 [2015]; People v Charles, 61 NY2d 321, 327 [1984]). Significantly, the identity of the victim is not one of the elements of the crime of murder in the second degree (see Penal Law § 125.25 [1]; People v Stanley, 23 AD3d 683, 684-685 [2005], lv denied 6 NY3d 818 [2006]; see also People v Jones, 41 AD3d 507, 508 [2007], lv denied 9 NY3d 877 [2007]). Here, the People chose to go beyond the elements that they were required to prove to obtain a conviction both by asserting in the indictment that defendant specifically intended to shoot Wright and by making that argument at trial. Nonetheless, the jury was not required to accept this part of the People's theory to convict defendant of murder in the second degree, so long as it found that the People had proven the elements of that crime beyond a reasonable doubt. Accordingly, we find that the instruction did not alter the prosecution's theory (see People v Charles, 61 NY2d at 327-329; People v Osinowo, 28 AD3d 1011, 1012-1013 [2006], lv denied 7 NY3d 792 [2006]; see also People v Flanders, 25 NY3d at 999; People v Treuber, 64 NY2d 817, 818 [1985]; compare People v Barnes, 50 NY2d 375, 379 n 3 [1980]).
For similar reasons, we reject defendant's contention that County Court's supplemental instruction prejudiced defendant by introducing the new legal principle of mistake of fact. As defendant argues, the People made no arguments based on that principle during the trial. However, defendant's theory of defense throughout the trial was that the gun went off accidentally and that defendant did not intend to shoot Wright or anyone else. This defense of accident would not have been altered or affected if the question whether defendant mistook Wright for someone else had been raised earlier; as previously noted, the identity of the victim is not an element of the crime of murder in the second degree. Thus, defendant was not prejudiced by the supplemental instruction, which was responsive to a reasonable interpretation of the jury's inquiry and did not foreclose its consideration of the element of intent (compare People v Wood, 163 AD3d 1485, 1488 [2018], lv denied 32 NY3d 1069 [2018]). Considering the totality of the circumstances (see People v Taylor, 26 NY3d at 227), we find that the supplemental instruction satisfied the court's obligation to fashion a meaningful response to the jury's request without causing prejudice to defendant (see People v Almodovar, 62 NY2d 126, 131-132 [1984]; People v Rawlinson, 170 AD3d at 1429; People v Roberts, 204 AD2d 974, 974-975 [1994], lv denied 84 NY2d 871 [1994]).
Finally, defendant contends that his sentence is harsh and excessive in view of his limited criminal history and his expressions of remorse. In view of the violent nature of defendant's conduct and its devastating impact on Wright's family and friends, we find no extraordinary circumstances or abuse of discretion warranting a reduction in the sentence (see People v Guzy, 167 AD3d 1230, 1238 [2018], lv denied 33 NY3d 948 [2019]; People v Stanford, 130 AD3d 1306, 1310 [2015], lv denied 26 NY3d 1043 [2015]).
Clark, Aarons, Pritzker and Reynolds Fitzgerald, JJ., concur.
ORDERED that the judgment is affirmed.



Footnotes

Footnote 1: The injury was later treated at a hospital, where West received stitches.

Footnote 2: The testimony was in conflict as to whether Wright had previously remained in the apartment throughout the encounter between West and defendant. Some witnesses testified that Wright had come outside briefly, either while West and defendant were fighting or immediately afterwards, that he had been upset about the fight and that he had then gone back indoors, while others testified that he did not leave the apartment until he came out to check on his sister.

Footnote 3: Outside the jury's presence and before giving this instruction, County Court advised counsel that it did not believe that the jury's question involved transferred intent and that it further did not believe that its supplemental instruction altered the theory of the prosecution.