People v Vandenburg (2020 NY Slip Op 07434)





People v Vandenburg


2020 NY Slip Op 07434


Decided on December 10, 2020


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: December 10, 2020

110015

[*1]The People of the State of New York, Respondent,
v
Joseph M. Vandenburg, Appellant.

Calendar Date: October 13, 2020

Before: Egan Jr., J.P., Mulvey, Aarons and Pritzker, JJ.


Mitchell Kessler, Cohoes, for appellant.
Mary Pat Donnelly, District Attorney, Troy (George J. Hoffman Jr. of counsel), for respondent.



Pritzker, J.
Appeal from a judgment of the County Court of Rensselaer County (Young, J.), rendered July 21, 2017, upon a verdict convicting defendant of the crimes of murder in the second degree and criminal possession of a weapon in the third degree.
Defendant was charged by indictment with murder in the second degree and criminal possession of a weapon in the third degree stemming from allegations that he stabbed and killed the victim while he was walking his dog shortly after 10:00 p.m. in the Town of North Greenbush, Rensselaer County. Following a hearing whereby defendant was found competent to stand trial, a jury trial ensued and defendant was convicted as charged. Defendant was sentenced to 25 years to life for his conviction of murder in the second degree and to a lesser concurrent prison term for his conviction of criminal possession of a weapon in the third degree. Defendant appeals. We affirm.
Defendant argues that the jury verdict is not supported by legally sufficient evidence and is against the weight of the evidence. "When considering a challenge to the legal sufficiency of the evidence, we view the evidence in the light most favorable to the People and evaluate whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial and as a matter of law satisfy the proof and burden requirements for every element of the crime charged" (People v Hernandez, 180 AD3d 1234, 1235 [2020] [internal quotation marks and citations omitted], lv denied 35 NY3d 993 [2020]; see People v Nunes, 168 AD3d 1187, 1187-1188 [2019], lv denied 33 NY3d 979 [2019]). "When undertaking a weight of the evidence review, we must first determine whether, based on all the credible evidence, a different finding would not have been unreasonable and[, if not,] then weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence. When conducting this review, we consider the evidence in a neutral light and defer to the jury's credibility assessments" (People v Conway, 179 AD3d 1218, 1218 [2020] [internal quotation marks and citations omitted], lv denied 35 NY3d 941 [2020]; see People v Lee, 183 AD3d 1183, 1187-1188 [2020], lv denied ___ NY3d ___ [Oct. 28, 2020]).
As relevant here, to obtain a conviction for murder in the second degree, the People bear the burden of proving that, "[w]ith intent to cause the death of another person, [the defendant] causes the death of such person" (Penal Law § 125.25 [1]). "For a conviction of criminal possession of a weapon in the third degree, the People have to prove that the defendant was previously convicted of a crime and that he or she has committed the offense of criminal possession of a weapon in the fourth degree (see Penal Law § 265.02 [1]), which requires, as [*2]relevant here, proof that the defendant knowingly 'possesse[d] any dagger, dangerous knife, . . . dangerous or deadly instrument or weapon with intent to use the same unlawfully against another'" (People v Harris, 186 AD3d 907, 908-909 [2020], quoting Penal Law § 265.01 [2]).
The victim's wife testified that, at approximately 10:00 p.m. on December 17, 2015, the victim left their residence to walk their dog and that, 10 to 15 minutes later, the dog returned without the victim. Unable to reach the victim on his mobile phone, the wife drove around the neighborhood and discovered the victim lying motionless on the front lawn of a residence located at the corner of Marion Avenue and Powell Street.[FN1] The wife testified that she was too shaken up to operate her mobile phone so she stopped a bicyclist who was riding by and asked him to call 911. Shortly thereafter, a local firefighter and two EMTs arrived at the scene. The firefighter testified that he observed a large hunting knife on the ground about three to four feet away from the victim's body. Testimony from one of the EMTs revealed that, after assessing the victim, resuscitation efforts were ceased as the victim's vital signs were "incompatible with life." Michael Sikirica, a forensic pathologist who conducted an autopsy of the victim, testified that the victim sustained 22 stab wounds to his head, neck, upper chest and extremities, as well as superficial injuries to his face. Sikirica also testified that some of the victim's neck and extremity wounds were consistent with the large hunting knife recovered from the scene on the night of the incident, but that the knife did not account for the deeper, fatal wound to the victim's chest. Ultimately, Sikirica opined that the cause of death was multiple stab wounds and the manner of death was homicide.
The People introduced video surveillance from a local liquor store where defendant purchased a bottle of vodka at approximately 8:45 p.m. on the night of the murder. An employee of the liquor store testified that defendant was wearing a gray hooded sweatshirt, with the hood up, and was not bleeding at all. The People also introduced testimony of an employee of a local convenience store, as well as video surveillance from the store, that established that defendant, donning dark facial hair, a gray hooded sweatshirt with the hood up and a red and black backpack, purchased a yellow Gatorade at 8:54 p.m. on the night of the murder. Testimony from multiple members of law enforcement established that a lemon-lime Gatorade bottle that appeared to have blood on it was found in the driveway of a home in the vicinity of the victim's body. Several witnesses testified to events that occurred immediately prior to and following the victim's murder, including the owner of the residence located on the corner of Marion Avenue and Powell Street, who testified that, shortly after 10:00 p.m., she heard male voices in front of her house. A pizza delivery driver [*3]testified that, just after 10:00 p.m., she turned onto Marion Avenue and observed a white male, about 5 feet 10 inches tall, wearing a gray hooded sweatshirt with the hood up and a backpack walking in the direction of Powell Street. Moments later, she saw the victim, whom she knew, walking his dog on Marion Avenue.
Raymond McCabe, the bicyclist that the wife stopped for assistance, testified that his shift at a local restaurant ended at 10:00 p.m. and that he left work and proceeded to ride his bicycle two miles to his home. On his way home, he observed a male with facial hair, approximately 5 feet 9 inches tall and possibly wearing a backpack, walking down the street away from Marion Avenue. As McCabe rode towards Marion Avenue and Powell Street, he saw the wife screaming for help and she asked him to call 911. While he called 911, he saw the victim's body lying face down on the ground. A local resident, who was the passenger in a car in the vicinity of the murder at approximately 10:45 p.m., testified that she observed an overweight male with dark facial hair — approximately 5 feet 8 inches to 6 feet tall and wearing very dark clothing and a red and black backpack — running down a hill towards the street. When the male got to the street and saw the car, he slowed down to a walking pace. The local resident testified that, at the time, she did not recognize who the person was, but that the person "looked more than familiar" to her. She also testified that she has known defendant and his family for many years as they live close to one another.
Defendant's mother, with whom defendant lived, testified that on the day of the murder, she arrived home in the evening after work and saw defendant briefly while he fixed himself dinner. Defendant then returned to his bedroom in the basement of the house. The next morning, at approximately 8:00 a.m., the mother awoke to find her vehicle missing from the driveway. The mother was able to determine that her vehicle was located at Crossgates Mall in Albany County and, being unable to reach or locate defendant, the mother called his parole officer. Defendant's parole officer testified that, after receiving the mother's call, he began to search for defendant and ultimately pushed his way through defendant's locked bedroom door. Therein, the mother and defendant's parole officer observed handwriting on defendant's bedroom wall that read "Die, he [or I] said so. Canada next." A blood-covered sweatshirt was affixed to defendant's bedroom wall by a knife. Defendant's parole officer testified that he had been in defendant's room a week prior and that neither the handwriting nor the sweatshirt and knife was there at that time. Testimony established that defendant was arrested while walking less than a quarter of a mile from Crossgates Mall. An investigator with the State Police testified that when defendant was taken into custody, the investigator observed injuries on defendant's right pinky finger[*4], left arm, left cheek and over defendant's left eye, as well as scratches on the upper part of defendant's right cheek, neck, left arm and right wrist.
Carrie McGinnis, a forensic scientist and DNA analyst with the State Police Forensic Investigation Center, testified that defendant's DNA profile matched the DNA profile from the mouth opening and the bottle cap of the Gatorade bottle that was found near the murder scene. Forensic examination of the knife recovered from the murder scene revealed a mixture profile from two male donors and that the victim and defendant could be included as possible contributors of DNA to that profile. In fact, McGinnis testified that it was 978.5 septillion times more likely that the donors to the mixture profile were the victim and defendant rather than two randomly selected unrelated individuals. McGinnis also testified that forensic examination of the sweatshirt affixed to defendant's bedroom wall also revealed a mixture profile, to which the victim's DNA profile was a major contributor. Insufficient genetic information precluded any DNA comparisons of the knife recovered from defendant's bedroom wall.
Viewing the foregoing evidence in the light most favorable to the People, the evidence was legally sufficient to support the verdict as to defendant's conviction of murder in the second degree (see People v Stover, 178 AD3d 1138, 1143-1144 [2019], lv denied 34 NY3d 1163 [2020]). In that regard, three witnesses testified that they observed an individual near the murder scene prior to and after the victim's murder that resembled defendant's appearance that night, as established by videographic evidence. The injuries and scratches to defendant's face and extremities when he was arrested the day after the murder were not observed when defendant patronized the liquor store and convenience store the night before, prior to the victim's murder. Finally, forensic examination detected defendant's DNA profile on the Gatorade bottle found near the murder scene — the same flavor purchased by defendant on the night of the murder — and the victim's DNA profile was found on the sweatshirt affixed to defendant's bedroom wall. Turning to the verdict as to defendant's conviction for criminal possession of a weapon in the third degree, the forensic examination of the knife recovered from the murder scene determined that it was 978.5 septillion times more likely that the victim and defendant were the donors to the mixture profile than two randomly selected individuals. Viewing this evidence in the light most favorable to the People, there is "a valid line of reasoning and permissible inferences from which a rational jury could have found the elements of the crime[] proved beyond a reasonable doubt" (People v Williams, 182 AD3d 776, 778 [2020] [internal quotation marks and citation omitted], lvs denied 35 NY3d 1070, 1071 [2020]). Further, although a different result would not have been unreasonable given that no witness testified [*5]that he or she saw defendant possess a knife or stab the victim, viewing the evidence in a neutral light and deferring to the jury's resolution of issues of credibility, we find that the verdict is not against the weight of the evidence (see People v Sloley, 179 AD3d 1308, 1310-1311 [2020], lv denied 35 NY3d 974 [2020]).
Defendant next argues that County Court erred in finding him fit to proceed to trial. "The key inquiry in determining whether a criminal defendant is fit for trial is whether he or she has sufficient present ability to consult with his or her lawyer with a reasonable degree of rational understanding — and whether he or she has a rational as well as factual understanding of the proceedings against him or her" (People v Bostic, 174 AD3d 1135, 1136 [2019] [internal quotation marks and citations omitted], lv denied 34 NY3d 1015 [2019]; see People v Richardson, 155 AD3d 1099, 1100 [2017]). "This standard requires merely a 'modicum of intelligence [to] assist counsel'" (People v Bates, 83 AD3d 1110, 1112 [2011], lv denied 21 NY3d 1072 [2013], quoting People v Francabandera, 33 NY2d 429, 436 [1974]), and "even an amnesia victim who cannot recall the events underlying his or her offense may be competent to stand trial" (People v Surdis, 77 AD3d 1018, 1018 n 1 [2010], lv denied 16 NY3d 800 [2011]). "In making this determination, a court may take into account the findings of any competency examination as well as its own observations of the defendant. Notably, trial fitness is a legal, judicial determination, and not a medical one, and we accord considerable deference to a trial court's determination in this regard" (People v Bostic, 174 AD3d at 1136 [internal quotation marks and citations omitted]; see People v Phillips, 16 NY3d 510, 517 [2011]).
Defendant was examined by a psychologist and a psychiatrist retained by the People, who both found that defendant was competent to stand trial. The People's psychologist interviewed defendant and opined that, although defendant has a psychiatric diagnosis, his condition would not interfere with his ability to participate in his defense, as he understood the judicial process, the roles of the various participants and was able to engage in conversation. Similarly, the People's psychiatrist, after reviewing the relevant records, interviewed defendant and determined that he understood the charges against him, the roles of those involved in his case and the implications of a guilty verdict. In contrast, a psychiatrist retained by defendant concluded that defendant would not be able to participate in his own defense because, among other reasons, defendant was unable to articulate how he would communicate with counsel in the event that he felt that a witness was being untruthful. However, defendant's psychiatrist acknowledged that defendant understood the role of the District Attorney and the judge and that, although defendant did not know how many jurors were on a jury, he did understand the [*6]role of the jury. Defendant's psychiatrist also acknowledged that he did not observe any outward manifestations of defendant's condition during the interview. County Court credited the findings of the People's examiners over those of defendant's and noted that, during the hearing, the court observed defendant as being attentive. Upon our review of the record, and according deference to County Court's credibility determinations regarding the conflicting testimony as to defendant's competence, we discern no basis upon which to disturb the court's ruling that defendant was fit to proceed to trial (see People v Babcock, 152 AD3d 962, 963-964 [2017], lv denied 30 NY3d 947 [2017]; People v Bates, 83 AD3d at 1112).[FN2]
Defendant's argument that County Court's admission of the DNA reports and related testimony violated his right to confront witnesses is unavailing. "In addressing a defendant's rights under the Confrontation Clause, if an out-of-court statement is testimonial in nature, it may not be introduced against the accused at trial unless the witness who made the statement is unavailable and the accused has had a prior opportunity to confront that witness" (People v Watkins, 180 AD3d 1222, 1232 [2020] [internal quotation marks and citation omitted], lvs denied 35 NY3d 1026, 1030 [2020]; see US Const, 6th Amend; NY Const, art I, § 6; People v John, 27 NY3d 294, 303 [2016]). It is well established that, "when confronted with testimonial DNA evidence at trial, a defendant is entitled to cross-examine 'an analyst who witnessed, performed or supervised the generation of [the] defendant's DNA profile, or who used his or her independent analysis on the raw data'" (People v Tsintzelis, 35 NY3d 925, 926 [2020], quoting People v John, 27 NY3d at 315; see People v Meadows, 180 AD3d 1244, 1247-1248 [2020], lv denied 35 NY3d 994 [2020]).
McGinnis testified that, in her capacity as a DNA analyst, she develops DNA profiles that are generated from evidence samples. McGinnis explained that the first step in this process is to take a sample from a piece of evidence and place it in a tube, which then goes through a lab process consisting of extraction, quantitation and amplification. At the end of this process, there are "millions of copies of the DNA" on which an instrument, called a genetic analyzer, is used to detect a DNA profile. The data from the genetic analyzer is imported into a software program that allows McGinnis to interpret the data and make comparisons. McGinnis testified that, in this case, she prepared buccal swabs taken from the victim and defendant, as well as nearly 90 items of evidence, for preliminary testing, all of which was performed by senior laboratory technicians. McGinnis testified that, after this testing, she received the data files from the genetic analyzer and imported them into the software program, which allowed her to interpret the DNA profiles and make the necessary comparisons. McGinnis acknowledged that although she [*7]did not conduct the laboratory testing, she ultimately formulated comparisons and wrote her reports based on her interpretation of the DNA profiles generated from the samples that she prepared. Accordingly, inasmuch as McGinnis "used her 'independent analysis on the raw data,'" the admission of the DNA reports into evidence was proper and did not violate the Confrontation Clause (People v Watkins, 180 AD3d at 1232, quoting People v John, 27 NY3d at 315; compare People v Tsintzelis, 35 NY3d at 926-927; People v Austin, 30 NY3d 98, 104-105 [2017]). Contrary to defendant's assertion, the People were not also required to produce the analysts who "witnessed, performed [or] supervised the extraction, quanti[tation], and amplification of the genetic material" (see People v John, 27 NY3d at 313). To the extent not specifically addressed herein, defendant's remaining contentions have been examined and found to be lacking in merit.
Egan Jr., J.P., Mulvey and Aarons, JJ., concur.
ORDERED that the judgment is affirmed.



Footnotes

Footnote 1: An aerial photograph of the area, which included street names, was admitted into evidence.

Footnote 2: Defendant's alternative argument, that County Court erred by failing to conduct a posttrial hearing to determine whether retrograde amnesia prevented him from assisting in his own defense, is unpreserved as defendant failed to make an appropriate posttrial motion to evaluate the fairness of the trial on the ground of mental incompetency (see People v Phillips, 16 NY3d at 515; People v Francabandera, 33 NY2d at 438-439).