People v Terry (2021 NY Slip Op 04256)





People v Terry


2021 NY Slip Op 04256


Decided on July 8, 2021


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:July 8, 2021

109778
[*1]The People of the State of New York, Respondent,
v
Clarence Terry IV, Also Known as Kenny, Appellant.

Calendar Date:May 27, 2021

Before:Lynch, J.P., Clark, Aarons and Colangelo, JJ.

William T. Morrison, Albany, for appellant.
Robert M. Carney, District Attorney, Schenectady (Peter H. Willis of counsel), for respondent.



Colangelo, J.
Appeal from a judgment of the County Court of Schenectady County (Caruso, J.), rendered July 14, 2017, upon a verdict convicting defendant of the crimes of attempted murder in the second degree, assault in the first degree, criminal use of a firearm in the first degree and criminal possession of a weapon in the second degree.
On July 12, 2016, the victim was shot in the neck while returning to the home of his fiancÉe. At some point the fiancÉe indicated to police that she believed that defendant, the father of two of her children, may have been the shooter. As a result, the police focused their attention on him and ultimately took him into custody on August 25, 2016. He was thereafter charged with attempted murder in the second degree, assault in the first degree, criminal use of a firearm in the first degree and criminal possession of a weapon in the second degree. Following a jury trial, defendant was convicted of all counts. County Court thereafter sentenced defendant to concurrent prison terms of 20 years, followed by five years of postrelease supervision, for his convictions of attempted murder in the second degree, assault in the first degree and criminal use of a firearm in the first degree, and to a lesser concurrent term on the remaining conviction. The court also directed that all of the sentences are to run concurrently. The court also issued a 28-year full stay away order of protection in the victim's favor. Defendant appeals.
Defendant challenges the verdict as unsupported by legally sufficient evidence and against the weight of the evidence, arguing primarily that the People's proof — which was largely circumstantial in nature — failed to establish his identity as the shooter beyond a reasonable doubt. "When considering a challenge to the legal sufficiency of the evidence, we view the evidence in the light most favorable to the People and evaluate whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial and as a matter of law satisfy the proof and burden requirements for every element of the crime[s] charged" (People v Vandenburg, 189 AD3d 1772, 1772 [2020] [internal quotation marks and citations omitted], lv denied 36 NY3d 1054 [2021]; see People v McCabe, 182 AD3d 772, 772-773 [2020]; People v Glover, 160 AD3d 1203, 1204 [2018]). "When undertaking a weight of the evidence review, we must first determine whether, based on all the credible evidence, a different finding would not have been unreasonable and, if not, then weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Vandenburg, 189 AD3d at 1772-1773 [internal quotation marks, brackets and citations omitted]; see People v Bleakley, 69 NY2d 490, 495 [1987]; People v Lukosavich[*2], 189 AD3d 1895, 1896 [2020]; People v Forney, 183 AD3d 1113, 1113-1114 [2020], lv denied 35 NY3d 1065 [2020]). "'When conducting this review, we consider the evidence in a neutral light and defer to the jury's credibility assessments'" (People v Kelsey, 174 AD3d 962, 962 [2019], lv denied 34 NY3d 982 [2019], cert denied ___ US ___ [May 3, 2021], quoting People v Gill, 168 AD3d 1140, 1140-1141 [2019]). Finally, we do not distinguish between direct or circumstantial evidence in conducting a legal sufficiency and/or weight of the evidence review (see People v Pierre, 162 AD3d 1325, 1327 [2018], lv denied 32 NY3d 1007 [2018]; People v Tunstall, 149 AD3d 1249, 1252 [2017], lv denied 30 NY3d 1023 [2017]; People v Venkatesan, 295 AD2d 635, 636 [2002], lv denied 99 NY2d 565 [2002], cert denied 549 US 854 [2006]).
As relevant here, "[a] person is guilty of an attempt to commit a crime when, with intent to commit a crime, he [or she] engages in conduct which tends to effect the commission of such crime" (Penal Law § 110.00). "A person is guilty of murder in the second degree when . . . [w]ith intent to cause the death of another person, he [or she] causes the death of such person" (Penal Law § 125.25 [1]). "A person is guilty of assault in the first degree when . . . [w]ith intent to cause serious physical injury to another person, he [or she] causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument" (Penal Law § 120.10 [1]).[FN1] "The intent to kill may be inferred from the surrounding circumstances and a defendant's actions" (People v White-Span, 182 AD3d 909, 910 [2020] [internal quotation marks, brackets and citations omitted], lv denied 35 NY3d 1071 [2020]). "Criminal intent may be inferred from the totality of the circumstances or from the natural and probable consequences of the defendant's conduct" (People v Conway, 179 AD3d 1218, 1219 [2020] [internal quotation marks, ellipsis, brackets and citations omitted], lv denied 35 NY3d 941 [2020]; see People v Pine, 126 AD3d 1112, 1114 [2015], lv denied 27 NY3d 1004 [2016]). "'Serious physical injury' means physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ" (Penal Law § 10.00 [10]).
A witness testified that, on the day of the shooting, he looked out of his bedroom window and observed the victim walking down the street wearing a white shirt, jeans and a red brimmed cap. The witness saw the victim stop on the street, heard a single gunshot [FN2] and saw the victim fall to the ground on his back, roll onto his left side, and crawl out of the witness's line of sight. The witness testified that the victim's shirt was stained with blood. The police were called and directed to the scene, whereupon they recovered the victim's cap and observed spots of blood on the ground. The victim testified [*3]that he had arrived at his fiancÉe's home the night before the shooting. In the morning hours before the shooting, he took his fiancÉe to work and returned to her home to care for her children and his child. As he and the children were making lunch in the kitchen, which is situated towards the rear of the house, defendant, known to the victim as the father of two of his fiancÉe's children, started banging on the front window of the house demanding to see his daughter and son. Defendant told the victim that he was taking the children with him and did so, despite knowing that defendant's visit had not been prearranged with the children's mother and despite the reluctance of defendant's daughter to go with him. The victim testified that he took the remaining children to their godparents' house to wait for the other children to be returned. The victim testified that he returned to the house, parked the car in front of the house and, while walking towards the back gate, "a shot rang out" and "[he] felt an impact in [his] back." He recalled that he fell to the ground, laid there for a few seconds and got into the car and drove to his fiancÉe's job. The victim was then transported to the hospital, suffering from a gunshot wound to the back of his neck, and underwent surgery to remove any fragments or debris that could cause infection. The injuries sustained by the victim include permanent scarring, weakened mobility in his left arm, and numbness from his jaw to his chest on the left side of his body.
The testimony of the victim's fiancÉe confirmed that the victim had arrived the previous evening and had been healthy in the morning. She testified that, when the victim arrived at her job after being shot, he told her that her children were with defendant and that "[he] got popped." She testified that she was afraid because there had been no prearranged plan for defendant to pick up the children and the victim had arrived at her job covered in blood. She eventually located her children and spoke to her then 11-year-old daughter. She then gave defendant's name and date of birth to a police officer who had responded to the hospital, and who forwarded the information to the investigating detective.
The daughter of defendant and the fiancÉe, who was 12 at the time of trial, testified that defendant was banging on the front door and told the victim, "I need to see my f****** kids." She testified that defendant was angry and she did not want to go with him because "every time [she] would go with him[,] he would . . . punch [her] and push [her] around and hit [her] and curse at [her]." According to the daughter's testimony, defendant forced her into his girlfriend's car, a silver Mercedes, and the girlfriend's son was also in the car. The daughter further testified that before the car pulled away, defendant told the victim "to stay right there" because he was going to come back to talk to the victim. The daughter confirmed that there was no plan [*4]for the children to be with defendant that day. Defendant then drove to his girlfriend's apartment complex. Once the children were inside, defendant insisted that he and his girlfriend leave the apartment. The daughter testified that prior to their departure, she observed defendant go into the car, check the back seat and then go into the trunk and remove something that he put under his sweater and underneath his armpit. The daughter testified that defendant's girlfriend returned alone and told her that defendant "went to go talk with somebody." The daughter also testified that defendant returned to the house approximately 30 minutes later, having been driven there by his father. According to the daughter, defendant received a telephone call and, after he hung up, hurried everyone to leave, telling his girlfriend to drop him off on an avenue and to take the children to their grandmother's or great grandmother's home, but not to take them back to their home.
A detective with the City of Schenectady Police Department testified that he was assigned to investigate the shooting and that no ballistic evidence was recovered and no eyewitnesses were located during a search of the scene of the shooting shortly after it occurred. He further testified that the absence of ballistic evidence indicated that either a revolver was the weapon used or that the shooter removed the shell casing from the scene. As part of the investigation, the detective reviewed video footage from a street camera located near the shooting that captured the victim pulling up to the front of his fiancÉe's house and another male being dropped off on a different street before the shooting and leaving from the same area after the shooting.
Based on defendant's name and birthdate provided by the victim's fiancÉe, the detective began a search and background check on defendant and, eventually, arrested him at his girlfriend's apartment. Defendant was questioned by the detective after being read and waiving his Miranda rights and told the detective that he believed that the victim was behaving inappropriately toward, possibly molesting, his children. Defendant admitted to the detective that he was driven to the area where the shooting occurred, walked directly to his sister's house, located a few houses away and across the street from the where the victim's fiancÉe lives, and went to his grandmother's house, also located on the same street. The detective testified that defendant stated that he then called his father to pick him up and he was taken back to his girlfriend's apartment.
The Chief Technical Resource Officer for the Schenectady County District Attorney's office testified that, among other things, the approximately 200 traffic cameras that are set throughout the city are set up on a patrol sequence where they look up one street for 10 seconds and rotate to look up a different street for 10 seconds, and continue in that pattern. The footage is time-stamped and cannot [*5]be altered after the fact. The footage captured a silver Mercedes traveling into and out of the neighborhood where the shooting occurred, a man — purported to be defendant — on foot walking towards the scene of the shooting only minutes before it occurred, and defendant's father's gold SUV leaving the neighborhood only minutes after the shooting. Defendant's girlfriend confirmed that she drove defendant to the neighborhood, and defendant's father confirmed that defendant came to his home at a time determined to be after the shooting and asked for a ride back to his girlfriend's apartment complex.
Defendant's ex-girlfriend testified that she had seen defendant cleaning a small bronze revolver in the kitchen of their apartment during the time that they lived together and had also seen the revolver and ammunition in a safe at their apartment. She further testified that defendant had voiced his dislike for the victim and confirmed that defendant told her that the victim was "[a]busing his child" and that defendant has said "[he] want[s] to kill the guy." An inmate, who was incarcerated and housed with defendant in the local jail, testified for the People in exchange for a reduced sentence on his pending charges. He testified that "[defendant] had explained to [him] that the victim in the case was messing, was in a relationship with his baby mother and he shot the victim, he shot the victim in his neck on the block that [defendant] lived on." According to the inmate, "[defendant] told [him] that he walked through a park on the same block that he lived on and that he got, he got away in a vehicle, but not exactly after it happened." Defendant bragged "[t]hat the [District Attorney] didn't have a strong enough case to convict him" and "[t]hat the victim was not going to testify" because his cousin had paid the victim not to testify. According to the inmate, he and defendant watched local news coverage of a raid on his cousin's house in which weapons were recovered and defendant "was saying he hoped that the weapon they found was not the weapon that he used to commit this crime and he was very nervous." Defendant told the inmate that after the shooting "he ran and later on he got picked up in a car."
Viewing the foregoing evidence in a light most favorable to the People, we find that there was legally sufficient evidence presented from which a rational jury could conclude that defendant committed the crimes for which he was convicted (see People v Rose, 185 AD3d 1228, 1229 [2020], lv denied 35 NY3d 1115 [2020]; People v McCabe, 182 AD3d at 774). Further, although a different verdict would not have been unreasonable given the lack of physical evidence, viewing the record evidence in a neutral light and according deference to the jury's credibility determinations, we find that the verdict was supported by the weight of the evidence (see People v Walker, 191 AD3d 1154, 1158 [2021], lv denied ___ NY3d ___ [May 27, 2021]; People v White-Span, 182 [*6]AD3d at 913-914; People v McCabe, 182 AD3d at 774; People v Greenfield, 167 AD3d 1060, 1062 [2018], lv denied 32 NY3d 1204 [2019]).
Defendant next contends that he was deprived of a fair trial based upon County Court's Molineux rulings, which permitted the People to present evidence of defendant's abusive treatment towards his daughter and defendant's prior possession of a revolver, and to introduce defendant's unredacted statement to police that his ex-girlfriend claimed that he had threatened her with a gun. "Although evidence of prior uncharged crimes or bad acts may never be presented for the sole purpose of establishing a defendant's criminal propensity or bad character, such evidence may be admissible if it is probative of some other material issue or fact in the case and its probative value outweighs any undue prejudice" (People v Gannon, 174 AD3d 1054, 1058 [2019] [internal quotation marks and citations omitted], lv denied 34 NY3d 980 [2019]; see People v Nunes, 168 AD3d 1187, 1192 [2019], lv denied 33 NY3d 979 [2019]).
We find that defendant's challenges to County Court's Molineux rulings have not been preserved for our review. As to the Molineux ruling regarding the permissible bounds of the daughter's testimony, defense counsel did not object to said ruling or render a contemporaneous objection to her testimony at trial (see People v Rose, 185 AD3d at 1232 [2020]). Nevertheless, we note that County Court gave an ameliorative instruction to the jury that cured any prejudice (see People v Ruiz, 148 AD3d 1212, 1216 [2017], lv denied 30 NY3d 983 [2017]). Defense counsel also failed to object to the court's Molineux ruling that defendant's ex-girlfriend could testify that she saw defendant in possession of the revolver only a few months before the shooting, and failed to render a contemporaneous objection to this testimony at trial (see People v Rose, 185 AD3d at 1232). In any event, evidence of a defendant's "possession of [a] firearm[] before [a] shooting [is] directly admissible" and serves to provide "background information tending to prove [a] defendant's means of access to the . . . weapon" (People v Wells, 141 AD3d 1013, 1019 [2016], lvs denied 28 NY3d 1183, 1189 [2017]). In addition, the court gave an ameliorative instruction to the jury that cured any prejudice (see People v Ruiz, 148 AD3d at 1216). Finally, defendant's contention that the court erred in admitting into evidence his unredacted statement was not preserved for our review as defendant failed to render an objection to its introduction (see People v Rose, 185 AD3d at 1232). Nevertheless, even if defendant had objected, prior bad acts may be admissible where they complete the narrative or provide necessary background information and, absent a showing of abuse of discretion, the court's ruling on such admission will not be disturbed (see People v Saunders, 176 AD3d 1384, 1389-1390 [2019], lv denied 35 NY3d 973 [2020]).
Defendant also challenges the sufficiency [*7]of the jury instruction given by County Court regarding permissible police deception during interrogation. The record reveals that the instruction given by the court, which included an expanded instruction from the Pattern Criminal Jury Instructions, had been agreed to on the record by the People and defense counsel. Defense counsel did not request additional language regarding abuse of police deception and the possibility it could lead to an involuntary confession. Therefore, any claim that the court's instructions should have contained additional language is unpreserved for review. Likewise, defendant's failure to raise timely and specific objections during the People's summation render his claims of prosecutorial misconduct largely unpreserved for our review as only one of the prosecutor's remarks was objected to (see CPL 470.05 [2]; People v Andrade, 172 AD3d 1547, 1553 [2019], lvs denied 34 NY3d 928, 937 [2019]). However, we find that the one allegedly improper statement that was preserved was not part of a pervasive pattern of misconduct that would have deprived defendant of a fair trial (see People v Wlasiuk, 136 AD3d 1101, 1103-1104 [2016], lv denied 27 NY3d 1009 [2016]). Defendant also argues that defense counsel was ineffective solely based upon the failure to object to the challenged comments. "However, because any such objections would have had little or no chance of success, defendant's ineffective assistance claim is unavailing" (People v Andrade, 172 AD3d at 1554; see People v Caban, 5 NY3d 143, 152 [2005]).
Lynch, J.P., Clark and Aarons, JJ., concur.
ORDERED that the judgment is affirmed.



Footnotes

Footnote 1: In light of defendant's contention that the reversal of his convictions is required because the People failed to prove that he was the shooter, if the evidence supporting defendant's convictions for attempted murder in the second degree and assault in the first degree is found to be legally sufficient and supported by the weight of the evidence, the same determination will obtain for the charges of criminal use of a firearm in the first degree and criminal possession of a weapon in the second degree.

Footnote 2: County Court permitted the witness to testify that he heard what he knew to be a gunshot based upon his hunting knowledge and experience.