People v Harris (2022 NY Slip Op 03548)

People v Harris

2022 NY Slip Op 03548

Decided on June 2, 2022

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:June 2, 2022

112407
[*1]The People of the State of New York, Respondent,
v
Stephan Harris, Also Known as Semmi, Appellant.

Calendar Date:April 25, 2022

Before:Garry, P.J., Aarons, Pritzker, Reynolds Fitzgerald and Fisher, JJ.

Tina Sodhi, Alternate Public Defender, Albany (Steven M. Sharp of counsel), for appellant.
P. David Soares, District Attorney, Albany (Vincent Stark of counsel), for respondent.

Fisher, J.
Appeal from a judgment of the Supreme Court (McDonough, J.), rendered August 6, 2018 in Albany County, upon a verdict convicting defendant of the crime of manslaughter in the first degree.
In June 2017, defendant was charged by indictment with murder in the second degree based on allegations that he intentionally stabbed the victim with a knife, causing the victim's death. Following a jury trial, at which defendant pursued a justification defense, defendant was acquitted of murder in the second degree and found guilty of the lesser included offense of manslaughter in the first degree. He was subsequently sentenced to a prison term of 25 years with 5 years of postrelease supervision. Defendant appeals.
Initially, defendant contends that the verdict is not supported by legally sufficient evidence and is against the weight of the evidence. We disagree. "In conducting a legal sufficiency analysis, this Court views the evidence in the light most favorable to the People and evaluates whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial and as a matter of law satisfy the proof and burden requirements for every element of the crime charged" (People v Warner, 194 AD3d 1098, 1099 [2021] [internal quotation marks and citations omitted], lv denied 37 NY3d 1030 [2021]; see People v Agudio, 194 AD3d 1270, 1271 [2021]). "In contrast, when undertaking a weight of the evidence review, this Court must first determine whether, based on all the credible evidence, a different finding would not have been unreasonable and then weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Sweet, 200 AD3d 1315, 1316 [2021] [internal quotation marks, brackets and citations omitted], lv denied 38 NY3d 930 [2022]; see People v Lyons, 200 AD3d 1222, 1225-1226 [2021], lv denied 37 NY3d 1162 [2022]). Although this Court must "review the evidence in a neutral light in making that assessment, we also accord great deference to the jury's credibility determinations, given that the jurors have the opportunity to view the witnesses, hear the testimony and observe demeanor" (People v Hodgins, 202 AD3d 1377, 1379 [2022] [internal quotation marks, brackets and citations omitted]; see People v Walker, 191 AD3d 1154, 1156 [2021], lv denied 37 NY3d 961 [2021]).
As relevant here, "[a] person is guilty of manslaughter in the first degree when[,] . . . [w]ith intent to cause serious physical injury to another person, he [or she] causes the death of such person" (Penal Law § 125.20 [1]). "[W]here a defendant advances a justification defense, the People are obliged to 'demonstrate beyond a reasonable doubt that [he or she] did not believe deadly force was necessary or that a reasonable [*2]person in the same situation would not have perceived that deadly force was necessary'" (People v Hodgins, 202 AD3d at 1379, quoting People v Umali, 10 NY3d 417, 425 [2008], cert denied 556 US 1110 [2009]; see Penal Law § 35.15 [1], [2]; People v Harris, 186 AD3d 907, 909 [2020], lv denied 36 NY3d 1120 [2021]). However, the use of "deadly physical force is not justified if the person knows he or she can avoid the use of force by retreating with complete safety. [Penal Law § 35.15] contains only one exception: there is no duty to retreat if a person is 'in his [or her] dwelling and not the initial aggressor'" (People v Hernandez, 98 NY2d 175, 180 [2002], quoting Penal Law § 35.15 [2] [a] [i]; see People v Ramirez, 118 AD3d 1108, 1112 [2014]; People v Curry, 85 AD3d 1209, 1212 [2011], lv denied 17 NY3d 815 [2011]).
Turning to our evidentiary review, several key facts were undisputed. First, the victim and a group of people, primarily his family or friends, were drinking alcohol, smoking marihuana and gambling over a dice game in a relative's garage. Later in the evening, defendant joined in on the dice game and had already been, and continued, drinking alcohol. Second, at some point the victim and defendant had a disagreement over a bet, wherein tensions escalated and the victim's friends forced defendant out of the garage. Finally, the victim followed defendant out of the garage and into the street, wherein the victim punched defendant twice in the face before the victim was stabbed twice and defendant ran away. The factual dispute at trial revolved around what transpired during the confrontation before defendant started to run away and whether defendant acted in self-defense when he stabbed the victim.
In that regard, the People presented the testimony of one of the victim's cousins, who testified that he observed the victim and defendant engage in a physical struggle along a truck parked in the street. The cousin testified that he saw the victim punch defendant in the face twice and then backed up to the other side of the street to catch his footing. Then, according to the cousin, defendant charged at the victim and stabbed the victim in his left shoulder. Upon being stabbed by defendant, the cousin heard the victim say, "you going to stab me, Bro? You going to stab me, really?" The cousin testified that he saw the victim grab his stab wound on his left shoulder when defendant stabbed the victim again, this time in the stomach. The cousin testified that after defendant stabbed the victim a second time, defendant started to run down the street, which is when the cousin heard a gunshot. The cousin admitted that, originally, he was not truthful with detectives about what he saw because he "was hoping that [the victim] would make it through and let him deal with this" — to let the victim decide "[w]hether he wanted to testify or whatever, keep it to the streets." The cousin further testified that, after he learned that the victim had [*3]died, he went to the police station to tell law enforcement what really happened.
The People also presented testimony from a bystander who returned home around the time that a group of people came out of the garage across the street from her residence. This individual testified that she had parked her car and was talking to her friend when she observed two people fighting in the street. She recognized the victim as one of the men fighting because she had known him since kindergarten. She explained that she saw defendant stab the victim and, once she saw the victim "going down," defendant started running away. She further testified that she "was right there" — approximately 10 to 15 feet from where the stabbing took place. The bystander identified defendant in court as the person who stabbed the victim because she had "[s]een him around." She clarified that she did not see the knife until after the incident, but indicated that she saw the victim beating up defendant "and then [she saw] a knife and then [the victim] walked to the street and went down." The bystander confirmed that she never saw anything in the victim's hands during the altercation, but she did see defendant with a knife.
Additionally, the People presented several other fact witnesses, including law enforcement officers and first responders. This included testimony from the first police officer to arrive on the scene, a detective sergeant with the Albany Police Department, who testified that when he walked over toward the garage, he saw a male in the "fetal position with his hands around his abdomen area." He further testified that the victim had "a traumatic injury, some kind of stab wound to the point where he was eviscerated and his intestines . . . were hanging out of his stomach wall and into his hands." The severity of the victim's injuries was confirmed by a firefighter/paramedic who rendered care to the victim. Another detective with the Albany Police Department testified that, at the time of the incident, he was working as a member of the forensic investigation unit that processed the scene of the incident. He explained that, in the area where defendant had run through, someone found a knife beside a tree that was buried under plant matter and an egg carton.
For his part, defendant testified that he knew the victim for over 10 years and indicated that the victim had "a reputation for violence in the community." Defendant explained that the victim's reputation was based upon him being violent while he was drinking, and that it was further known that the victim would carry knives with him. Defendant testified that he knew the victim was carrying a knife the night of the incident because the victim used it to open a cigar earlier that night. Defendant denied carrying a knife.
Defendant explained that, when tensions started to escalate between him and the victim, he was the banker of the dice game and that the others in the garage were losing their money to [*4]him and becoming mad at him. Defendant testified that he felt threatened, particularly when other people started to get involved in the gambling dispute because they were all on the victim's side. Defendant testified that he was then "dragged out" of the garage by the victim's friends, who were shouting to the victim to "f*** 'em up, take our money back, make sure we get our money off him." Then, according to defendant, the victim also came out of the garage and "put his hands on [defendant]," causing them both to stumble and fall over. Defendant explained that, as he was trying to get back up off the ground, the victim punched him twice in the face. Defendant claimed that he "tried to escape" and was looking for "somewhere to run" but, as he tried to run across the street, the victim was pulling on his shirt and they both tripped on the curb and fell again. When they fell, defendant saw "a knife that basically went sliding across the ground." Defendant said he knew the knife belonged to the victim because the victim pulled it out and started to chase him — which is why defendant attempted to run across the street and run away in the first instance. After the knife was on the ground, defendant testified that both of them reached for it, but he got to it faster than the victim did. When asked what happened next, defendant testified that they struggled and, "in the process of tussling [defendant] just swung the knife twice back and forth just to get [the victim] off [him]." Defendant explained that, when he was swinging the knife at the victim, he "was not trying to kill [the victim], [he] just was trying to defend [himself] and not get [himself] killed." Defendant said that he "stood up and immediately looked for another escape route," saw he had a "clear path" and started to run when shots were fired at him. He admitted that he still had the knife in his hand as he ran, but he dropped it when he fell in a community garden that he was running through. Defendant further testified that he did not know how badly the victim was hurt based on their altercation and he did not go to the police about what happened because he was scared his version of the events would not be believed since the others at the garage were the family and friends of the victim.
Viewing the evidence in the light most favorable to the People, there is a valid line of reasoning and permissible inferences from which a rational jury could conclude that defendant committed the crime of manslaughter in the first degree (see People v Warner, 194 AD3d at 1103; People v Vandenburg, 189 AD3d 1772, 1776 [2020], lv denied 36 NY3d 1054 [2021]; People v Rudge, 185 AD3d 1214, 1216 [2020], lv denied 35 NY3d 1070 [2020]). In that regard, two witnesses testified that they observed defendant stab the victim. The cousin specifically testified that the victim had backed up to catch his footing when defendant charged the victim and stabbed him first in the left shoulder and then again [*5]in the stomach before running away. Additionally, first responders testified as to the severity of the victim's stab wound. Other forensic evidence placing defendant at the scene of the incident further supports the verdict as being based upon legally sufficient evidence (see People v Warner, 194 AD3d at 1103; People v Green, 190 AD3d 1094, 1098 [2021], lv denied 36 NY3d 1097 [2021]).
Although a different result would not have been unreasonable since defendant's trial strategy was based on self-defense and because the People's case primarily relied on eye-witness testimony, when viewing the evidence in a neutral light and deferring to the jury's credibility determinations, we conclude that the verdict is not against the weight of the evidence (see People v Danielson, 9 NY3d 342, 349 [2007]; People v Vandenburg, 189 AD3d at 1776). Even though defendant testified that he was acting in self-defense and was not the initial aggressor, there was unequivocal evidence that defendant could have retreated before stabbing the victim in the stomach (see Penal Law § 35.15 [2] [a]). Witness testimony also indicated that there was sufficient temporal delay between the two stabs, during which time the victim was able to grab his shoulder wound and call out to defendant before defendant stabbed him again in the stomach. Thus, the People demonstrated beyond a reasonable doubt that deadly force was not necessary "or that a reasonable person in the same situation would not have perceived that deadly force was necessary" (People v Umali, 10 NY3d at 425; see People v Danielson, 9 NY3d at 348; People v Lekovic, 200 AD3d 1501, 1504 [2021], lv denied ___ NY3d ___ [Apr. 12, 2022]; People v Johnson, 183 AD3d 77, 87-88 [2020], lv denied 35 NY3d 993 [2020]).
However, we find merit in defendant's assertion that Supreme Court inadequately charged the jury regarding his justification defense. Although this issue is unpreserved inasmuch as defendant failed to raise it during the charge conference and did not object to the final charge (see People v Linares, 167 AD3d 1067, 1070 [2018], lv denied 33 NY3d 950 [2019]; People v Reese, 166 AD3d 1057, 1062 [2018], lv denied 33 NY3d 953 [2019]), we nevertheless find it appropriate to exercise our interest of justice jurisdiction to take corrective action and reverse defendant's conviction (see CPL 470.15 [6] [a]; People v Daniels, 174 AD3d 955, 957 [2019], lvs dismissed 34 NY3d 950, 952 [2019]; see also People v Herrera, 193 AD3d 189, 192 [2021], lv denied 37 NY3d 957 [2021]).
Where, as here, a defendant raises a claim of self-defense, the trial court commits reversible error if it fails to "instruct the jury that, if it finds the defendant not guilty of a greater charge on the basis of justification, it is not to consider any lesser counts" (People v Daniels, 174 AD3d at 957 [internal quotation marks, brackets and citations omitted]; see People v Herrera, 193 AD3d at 192-193; People v Akbar, 169 AD3d 708, 709-710 [2019], lv [*6]dismissed 33 NY3d 1101 [2019]; People v Velez, 131 AD3d 129, 133-134 [2015]). This error was compounded by the verdict sheet, which directed the jury to consider manslaughter in the first degree if the jury found defendant not guilty of murder in the second degree; the verdict sheet did not contain a qualifier if the acquittal of murder was based on the defense of justification (see People v Daniels, 174 AD3d at 958; People v Rosario, 169 AD3d 1066, 1067-1068 [2019]). Even though, as the People argue, "the jury may have acquitted on the top charge[] without relying on defendant's justification defense, it is nevertheless impossible to discern whether acquittal of the top count[] was based on the jury's finding of justification so as to mandate acquittal on the lesser count[] to which justification also applied" (People v Daniels, 174 AD3d at 958 [internal quotation marks, brackets, ellipsis and citations omitted]; see People v Savillo, 185 AD3d 840, 842 [2020]; People v Akbar, 169 AD3d at 710). Accordingly, reversal is required and a new trial is necessary (see People v Daniels, 174 AD3d at 958; see also People v Herrera, 193 AD3d at 193; People v Akbar, 169 AD3d at 710). Defendant's remaining arguments have been rendered academic by our decision.
Garry, P.J., Aarons, Pritzker and Reynolds Fitzgerald, JJ., concur.
ORDERED that the judgment is reversed, as a matter of discretion in the interest of justice, and matter remitted to the Supreme Court for a new trial.